**STATE of Missouri, Respondent,**

v.

**Brian J. KINDER, Appellant.**

No. 75082.

Supreme Court of Missouri,
En Banc.

Dec. 17, 1996.

Rehearing Denied Jan. 21, 1997.

William J. Swift, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Breck K. Burgess, Assistant Attorney General, Jefferson City, for respondent.

Thomas Carter, II, St. Louis, amicus National Legal Aid and Defenders Assn.

LIMBAUGH, Judge.

A jury found Brian Kinder guilty of first degree murder, rape, and armed criminal action. He was sentenced to death and two consecutive life terms. The postconviction court overruled Kinder's Rule 29.15 motion after an evidentiary hearing. On consolidated appeal, we affirm the conviction, sentence, and denial of postconviction relief.

## I. FACTS

On Friday, December 21, 1990, at about 6:30 p.m., defendant Brian Kinder went with Don Williams to the home of Williams' estranged wife, Cynthia Williams, to pick up two of the Williams' children for the weekend. The Williams' third child, Donald Culton, remained at his mother's home for the evening. Cynthia Williams came home from work and then went out with relatives on that Friday evening. At about 10:00 or 10:30 that same night, Kinder returned to his own home. Earl Smith, who was at the Kinder home, saw Kinder with a pipe that had black tape on one end. Kinder left his home at about 11:00 or 11:30 p.m.

At about 12:00 or 12:30 a.m., Kinder, with the pipe in hand, was standing outside of Gibb's Esquire Bar, which was 40 yards from Cynthia Williams' home, and while there he got into an argument with Dwayne Wingo. Wingo left the area at about 1:00 a.m., drove past Cynthia Williams' home to a restaurant, and then returned to the bar. During the trip he saw Kinder coming out of Cynthia Williams' home, and on his return, he saw Kinder back in front of the bar.

At some point after midnight and after Cynthia Williams had returned home, Donald Culton, Cynthia's son, was awakened by a noise that sounded like a briefcase or shoes dragging on the floor. He also heard "the sound of someone trying to breathe." The next morning, Donald found his mother's unclothed body lying on her bed in a pool of blood. He then went to his next-door neighbors' house and told them his mother was dead, and the police were called.

Police processed the crime scene that Saturday morning and began an investigation. A pathologist determined that Cynthia Williams died from extensive head injuries caused by multiple blows with a reasonably heavy blunt object, and that her injuries were consistent with being beaten with a pipe. In addition, DNA testing revealed that genetic material in the semen recovered from the body matched Kinder's genetic profile.

Based on this and other incriminating evidence, the jury found Kinder guilty as charged. During penalty phase, the jury found two statutory aggravating circum-

stances and recommended a death sentence, which the trial court then imposed.

## II. PRETRIAL

### A. MOTION TO DISQUALIFY JUDGE

Six days before the trial was scheduled to begin, the trial judge, who was facing an election that year, issued a press release announcing his decision to switch parties from Democrat to Republican. Kinder, an indigent African–American, then filed a motion to disqualify on the ground that the press release reflected that the trial judge could not fairly serve on a case involving an unemployed African–American. The press release, which was the sole evidence Kinder presented in support of the motion, stated, in relevant part, as follows:

> The truth is that I have noticed in recent years that the Democrat party places far too much emphasis on representing minorities such as homosexuals, people who don't want to work, and people with a skin that's any color but white. Their reverse-discriminatory quotas and affirmative action, in the work place as well as in schools and colleges, are repugnant to me.... I believe that a person should be advanced and promoted, in this life, on the basis of initiative, qualifications, and willingness to work, not simply on the color of his or her skin, or sexual preference.

> While minorities need to be represented, or [sic] course, I believe the time has come for us to place much more emphasis and concern on the hard-working taxpayers in this country.... That majority group of our citizens seems to have been virtually forgotten by the Democrat party.

After a hearing, the motion was denied, and Kinder now presses the point on appeal.

■ It is presumed that judges act with honesty and integrity, *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464–65, 43 L.Ed.2d 712 (1975), and will not undertake to preside in a trial in which they cannot be impartial, *see, e.g., State v. McElroy,* 894 S.W.2d 180, 189 (Mo.App.1995); *State v. Cooper,* 811 S.W.2d 786, 791 (Mo.App.1991). That presumption is overcome, and disqualification of a judge is required, however, if a reasonable person, giving due regard to that presumption, would find an appearance of impropriety and doubt the impartiality of the Court. *See State v. Smulls,* 935 S.W.2d 9, 16–17 (Mo. banc 1996); *State v. Nunley,* 923 S.W.2d 911, 918 (Mo. banc 1996). The rule announced in *Smulls* and *Nunley* is drawn from our Code of Judicial Conduct, Rule 2, Canons 2 and 3(C), which provide that a judge should avoid the appearance of impropriety and shall perform judicial duties without bias or prejudice, and Rule 2, Canon 3(D), which provides that a judge should recuse in a proceeding in which the judge's impartiality might reasonably be questioned.

■ In this case, we do not agree that the statements in the press release, when coupled with all other relevant considerations, would cause a reasonable person to question the impartiality of the court. In context, the statements merely express the trial judge's dissatisfaction with affirmative action and government entitlement programs. To the extent that the comments can be read to disparage minorities, there is little point in defending them, even as the political act they were intended to be. But they are a political act, not a judicial one, and, as such, they do not necessarily have any bearing on the judge's in-court treatment of minorities. At the hearing on the motion, the trial judge's response, ignored or disregarded by the defendant, should have set to rest any concern. The court stated:

> The Court is not prejudiced against this defendant or any black person in any degree. The Court, as a matter of fact, and the Court's record will show, having served in the Missouri legislature for 16 years, that there is no stronger believer in constitutional rights than this Court. People get confused sometimes when you talk about group rights, civil rights. Or white rights, or black rights, or yellow rights, when they start talking that way, they lost me. As far as this Court is concerned every individual and every citizen of this country is absolutely entitled to their individual constitutional rights, whether they are yellow, red, white, black, or polka dot. It doesn't make any difference to this Court. A person is a person, and an individual is an

individual. I think people get off the track when they start talking about color. But insofar as this Court is concerned, there is no stronger defender of individual constitutional rights, and this Court and this defendant can rests assured and if he doesn't know it now he will know it after the trial, I am sure.

This defendant can rest assured there is no prejudice on the part of this Court. If there is prejudice in any direction, it is prejudice toward upholding each individual's constitutional rights. As I say, whether the individual be white, black, red, yellow, or whatever, it doesn't make any difference to this Court. Therefore, the motion for recusal is overruled.

By all accounts, the trial judge was true to his word, and Kinder, himself, is unable to point to any statement or ruling or other conduct by the trial judge during the course of the trial that bears any hint of bias. Indeed, Judge Kennedy–Bader, who presided at the Rule 29.15 hearing, found specifically that the trial judge did not exhibit racial bias in the conduct of the underlying trial.

According to the dissent, *Smulls* requires disqualification of the judge whenever the judge has made any statement, in court or out of court, that might be considered offensive to minorities. In fact, *Smulls* turned largely on a narrower legal point. The trial judge made specific comments on the record in that case, raising genuine doubts as to his willingness to apply *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and in particular, he expressed an apparent unwillingness to follow the law despite his disagreement with it. *Smulls* should be read no more broadly than for the proposition that a judicial statement—on the record or off—that raises a genuine doubt as to the judge's willingness to follow the law, provides a basis for recusal or, if the judge refuses to recuse, reversal on appeal. In that instance, the presumption of lack of judicial bias is overcome, and, as the Court stated in *Smulls,* the judge is at that point no longer afforded the benefit of the doubt. Therefore, this case is distinguished from *Smulls* because the judge made no statement that could reasonably be perceived as a threat to ignore the law in favor of his own policy preferences.

## B. REQUEST FOR CONTINUANCE

Kinder next contends that the trial court erred by denying his request for a continuance of trial so that an independent psychiatric examination could be completed. In November 1991, in response to defense counsel's motion, the trial judge ordered that Kinder undergo a psychiatric examination to be conducted by Dr. Armour, a psychiatrist. Dr. Armour filed a report on January 13, 1992, in which he stated that Kinder was competent to proceed and did not suffer from a mental disease or defect at the time of the alleged offense. On January 23, 1992, Kinder filed his objections to Dr. Armour's opinions and requested an independent examination by a psychiatrist of his own choosing. Four days later, on January 27, the trial judge ordered that an independent examination take place, and that the report from the examination be filed by March 6, 1992. At that time, the trial date was set for April 6, 1992. On February 23, 1992, Dr. Parwatikar, the psychiatrist hired to conduct the independent examination, suffered a heart attack. Kinder then filed for a continuance on March 18, 1992, stating that Dr. Parwatikar would be hospitalized until March 30, 1992, and that it was unlikely that the examination would be completed by April 6, 1992. The trial judge held a hearing on the continuance motion on March 23, 1992, and denied the request.

■ It is well-established that the decision to grant or deny a continuance is within the sound discretion of the trial court. *State v. Schaal,* 806 S.W.2d 659, 666 (Mo. banc 1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992). Moreover, a very strong showing is required to prove abuse of that discretion, with the party requesting the continuance bearing the burden of showing prejudice. *Id.* This rule applies even where a continuance is sought because of the absence of a material witness. *State v. Coats,* 835 S.W.2d 430, 433 (Mo.App.1992).

■ Rule 24.10 sets forth what must be shown in an application for continuance based on the unavailability of a witness. In

particular, the application must present facts showing the materiality of the evidence sought to be obtained and what particular facts the defendant believes the witness will prove. Rule 24.10(a), (c). In this case, the record reveals that Kinder's application for continuance completely failed to meet either of these requirements. The application did not allege what facts or evidence to which Dr. Parwatikar would testify and certainly did not allege that these facts or evidence would show that Kinder had ever suffered from a mental disease or defect. Although at the March 23rd hearing on the application for continuance, Kinder's counsel stated that she had "received information that there may also be a possibility of some type of neurological deficit," she still did not allege that this information came from Dr. Parwatikar or that he would provide evidence that Kinder had a neurological deficit.

In addition, Kinder has not met his burden of showing prejudice. Kinder argues that he was prejudiced by the denial of his continuance motion because there was no opportunity for a second determination as to his competency at the time of the alleged offense. What Kinder must show, however, is that if given the opportunity, he would have introduced evidence establishing that he was indeed incompetent. He makes no attempt to do so. In view of the failure to comply with the requirements of Rule 24.10 and the lack of prejudice, the trial court did not abuse its discretion in denying the motion for continuance.

## C. FAILURE TO CONDUCT COMPETENCY HEARING

Kinder also argues that the trial court erred by failing to conduct a competency hearing. Once Kinder filed his objections to Dr. Armour's report, the trial court was required to hold a hearing on the issue, § 552.020.7, RSMo 1986, but apparently this hearing was never conducted. The record does not indicate, however, that Kinder objected to the failure of the trial court to hold the required hearing. Because this issue was not raised by Kinder at trial or in his motion for new trial, it is not preserved for appeal and is subject only to plain error review. Under Rule 30.20, "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." There is no evidence that a manifest injustice has resulted from the failure to hold the competency hearing. Kinder alleges neither that he was incompetent to stand trial nor that he suffered from a mental disease or defect, nor does he present any evidence that a competency hearing would have resulted in anything other than a finding that he was mentally fit. This point is denied.

## D. CHANGE OF VENUE

Kinder claims the trial court erred in overruling his motion for change of venue for cause. The decision to grant or deny a change of venue for cause is a matter of trial court discretion, and its ruling will not be reversed absent an abuse of discretion. *State v. Feltrop*, 803 S.W.2d 1, 6 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). A change of venue is required when it is necessary to assure the defendant a fair and impartial trial. *Groppi v. Wisconsin*, 400 U.S. 505, 507–11, 91 S.Ct. 490, 491–94, 27 L.Ed.2d 571 (1971). A trial court abuses its discretion when the record shows that the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot occur there. *Feltrop*, 803 S.W.2d at 6.

Kinder based his motion for change of venue on pretrial publicity and the racial make-up of Jefferson County, the population of which included less than one percent African–Americans. He argues that several newspaper articles concerning the crime were published, and that questioning during voir dire revealed that there were venirepersons who were familiar with the media coverage and who had formed an opinion about the case. Only one of the venirepersons who had heard of the case in the media, however, served as a juror, and she indicated that she had not formed an opinion and could be fair and impartial. The trial court does not abuse its discretion in denying a change of venue where jurors who had been exposed to pretrial publicity state that

they could try the case in a fair and impartial manner. *Id.* at 7. As to the racial make-up of Jefferson County, Kinder has not presented any evidence to support his allegation that county inhabitants were so prejudiced against him because of racial bias that he could not receive a fair and impartial trial. We conclude that the trial court did not abuse its discretion by denying the motion for change of venue on either of the grounds raised.

### E. MOTION TO DISQUALIFY PROSECUTOR

For his final pretrial complaint, Kinder claims the trial court erred by denying his motion to disqualify Assistant Prosecutor Appelbaum. The basis for the motion for disqualification was that Appelbaum was a potential witness. At the hearing on this motion, Appelbaum testified that he was at the police station when Kinder was in custody as a murder suspect and that he traveled in the same police car that was used to transport Kinder to the Hillsboro jail, but he made clear that he was not present during any questioning. Nevertheless, Kinder claims that Appelbaum remained a potential witness because he could be called to testify about what occurred at the police station and during the car ride. He further asserts that Appelbaum would be motivated to maintain that he had done nothing improper, and that this motivation was a personal interest that would deny Kinder fair treatment. During the trial, however, Appelbaum was never called as a witness and, therefore, Kinder has utterly failed to demonstrate any prejudice from the trial court's ruling. This point is denied.

### III. VOIR DIRE

Kinder contends that the trial court erred in striking six venirepersons for cause, two of whom initially expressed reservations about being able to consider the death penalty. While it is clear that jurors cannot be excluded in a capital punishment case just because they reveal conscientious objections to capital punishment, *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968); *Gray v. Mississippi*, 481 U.S. 648, 657, 107 S.Ct. 2045, 2050–51, 95 L.Ed.2d 622 (1987), they can be excluded if they are "irrevocably committed … to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings," *Witherspoon*, 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21; *Gray*, 481 U.S. at 657–58, 107 S.Ct. at 2051. As the Supreme Court later explained, the standard for determining when a prospective juror may be excluded for cause because of his or her views on the death penalty is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). *See also State v. Richardson*, 923 S.W.2d 301, 308–09 (Mo. banc), *cert. denied*, —— U.S. ——, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996). Subject to the rules just stated, the trial court has broad discretion in determining qualifications of prospective jurors, and its ruling will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion. *State v. Treadway*, 558 S.W.2d 646, 649 (Mo. banc 1977), *cert. denied*, 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1978), *and overruled on other grounds by Sours v. State*, 593 S.W.2d 208 (Mo. banc 1980); *State v. McMillin*, 783 S.W.2d 82, 91 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990).

Venirepersons Kelley and Vrouvas were struck because of opinions they expressed about the death penalty. Both persons indicated during voir dire that they would be unable to impose the death penalty under any circumstances, but, as Kinder points out, they also made statements to the opposite effect, indicating that they could consider the death penalty as a punishment. We are not bound solely by the statements favoring Kinder's position because the ruling on a challenge for cause is to be based on the whole record. *Treadway*, 558 S.W.2d at 649; *State v. Brown*, 902 S.W.2d 278, 285 (Mo. banc 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995). When faced with the conflicting testimony from

Kelley and Vrouvas, we cannot say that the trial court abused its discretion by giving more weight to one response than the other and in finding that the venirepersons could not properly consider the death penalty. Therefore, the trial court did not err in striking these two venirepersons.

Three other potential jurors, Lewis, Lynde and Courtois, also gave responses that justified the trial court's conclusion that they would be unable to perform their duties as jurors. Lewis and Lynde both expressed reservations about sitting in judgment of another person. Lynde stated that he could consider both life imprisonment and the death penalty as punishments, but he did not feel that he was qualified to make a decision on punishment. Lewis stated that he would have difficulty considering any punishment and making a sentencing decision. Courtois indicated that she was having difficulty understanding any of what was going on. We conclude that the trial court did not abuse its discretion in striking these three venirepersons.

The circumstances of the sixth person disqualified, venireperson Kramper, are more unusual than the others. The record shows that during voir dire the trial court received notice that venireperson Kramper wished to speak with the trial judge privately concerning a personal matter. Neither party objected to such a meeting. After the judge met with Kramper, he informed the parties that Kramper was disqualified for cause, because Kramper stated that he could not be fair and impartial. The court declined to make a sealed record of the testimony, but informed the parties that Kramper had stated he belonged to an all-white organization, and that he could not be fair to a black defendant. At Kinder's Rule 29.15 hearing, Kramper testified that he told the trial judge that he was a member of an organization that he thought was racially exclusive, and that he was of the opinion that he should not serve on the jury. He explained that because of his membership in the organization he felt that it would not look right if he served as a juror, and he stated further that he was offended that the organization to which he belonged might be racially exclusive.

Kinder argues that the disqualification of Kramper from the venire panel and the denial of the request for a sealed record deprived him of a potential juror who was especially concerned about the fairness of the proceedings to an African–American defendant. In *State v. Reuscher,* 827 S.W.2d 710, 714 (Mo. banc), *cert. denied,* 506 U.S. 837, 113 S.Ct. 114, 121 L.Ed.2d 71 (1992), this Court held: "When a venireperson in a case in which the death penalty may be imposed is excluded for reasons unrelated to the person's scruples against the death penalty, the appropriate rule is that error may not be predicated upon the sustaining of a challenge for cause if a full panel of qualified jurors is tendered for peremptory challenges." The rule is based on the notion that the defendant cannot be prejudiced if indeed he or she is afforded a full panel of qualified jurors. We can find no reason not to apply this same rule when a trial court disqualifies a juror for cause on the court's own motion. In the present case, the reasons for the disqualification were unrelated to any objections to the death penalty, and Kinder has not argued and the record does not show that the tendered panel was not qualified. Under these circumstances, he was not prejudiced. Similarly, Kinder cannot demonstrate any prejudice from the denial to make a sealed record. While the trial court should have made a more complete record for review, the disqualification of the juror would still be upheld unless Kinder established that a full panel of qualified jurors was not tendered. This point is denied.

## IV. GUILT PHASE

### A. OFFICER THOMAS' TESTIMONY

Kinder asserts that the trial court erred in its admission of Officer Thomas' testimony. Officer Thomas first interrogated Kinder on the night of December 22, 1990, and again about a week later. During this second questioning, Thomas asked Kinder if he would swear on the Bible that he was not involved in Cynthia Williams' death. Thomas testified that Kinder said that he would, but that he refused to do so with his legs uncrossed.

Kinder's position is that the testimony was irrelevant and that its admission was a violation of due process and an improper comment on his constitutional right to remain silent. In ruling on the relevance of evidence, trial courts are given broad discretion, and without a clear showing of an abuse of that discretion, appellate courts will not interfere with the trial court's ruling. *State v. Parkhurst*, 845 S.W.2d 31, 36 (Mo. banc 1992). In this instance, Kinder's unwillingness to swear to his innocence on the Bible with his legs uncrossed was relevant to show Kinder's consciousness of his guilt. Furthermore, the testimony was not an improper comment on Kinder's right to remain silent, because evidence of a defendant's silence or refusal to answer questions is only disallowed if the defendant was in custody. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *State v. Hornbeck*, 492 S.W.2d 802 (Mo.1973). As noted, Kinder was not in custody at the time of the questioning. Officer Thomas' testimony was properly admitted.

## B. TESTIMONY OF OFFICER CARLE

Kinder argues that the trial court erred in its admission of testimony from Officer Carle that Kinder was not present at Cynthia Williams' funeral and that his name was not in the sign-in log for her funeral. Because Kinder did not preserve this claim for appellate review, he requests relief under the plain error rule. Kinder argues that this testimony was irrelevant, but he has failed to show that its admission resulted in a manifest injustice. The inference that Kinder might have been the killer because he failed to attend the funeral is so slight that it could not have affected the outcome of the case. Therefore, he is not entitled to plain error relief. This point is denied.

## C. DNA EVIDENCE

On several different fronts, Kinder attacks the testimony and evidence presented by Dr. Allen, the State's DNA expert. Dr. Allen testified at both the *Frye* hearing, which was conducted to determine the admissibility of the DNA evidence, and at Kinder's trial. To carry out his analysis, he tested blood samples belonging to Kinder, the victim, and Donald Williams, and the vaginal swabs obtained from the victim's body. Using the restriction fragment length polymorphism (RFLP) method to determine the genetic profile for each of the DNA samples, Dr. Allen concluded that the DNA material obtained from the sexual assault swab matched Kinder's DNA profile. He then used genetic probability calculations to determine that the probability of a random match was 1 in 8.9 million. This statistical evidence was offered to help the jury evaluate the significance of the finding that a sample of DNA obtained from a victim matched the DNA profile of the defendant. The statistical estimate is interpreted as the probability that a person selected at random from a comparison population would have a DNA profile that matches that of the crime sample. *See State v. Morel*, 676 A.2d 1347, 1352 (R.I.1996). Stated another way, it informs the jury of the probability that a defendant's DNA sample matches that from the crime scene purely by chance. *Id.* Of the several different methods that can be used to obtain the population frequency statistics, Dr. Allen used the product rule method. Kinder argues that the product rule is not generally accepted, and that statistics calculated using the rule are inadmissible.

This Court first addressed the question of the admissibility of DNA evidence in *State v. Davis*, 814 S.W.2d 593 (Mo. banc 1991), *cert. denied*, 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992), by applying the *Frye* standard. This standard requires that results of scientific procedures "may be admitted only if the procedure is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.'" *Davis*, 814 S.W.2d at 600 (quoting *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir. 1923)). We were persuaded in that case that the RFLP method of DNA analysis is generally accepted in the scientific community. *Id.* at 602–03. We then concluded that the decision to admit or exclude expert testimony is within the trial court's sound discretion, and we found no abuse of discretion in the admission of DNA fingerprinting evidence. *Id.* at 603 (citing *State v. Taylor*, 663 S.W.2d 235, 239 (Mo. banc 1984)). In this case,

however, we are faced with a question that was not at issue in *Davis:* the reliability of the statistical means that are used to attach a numerical significance to a genetic match between two samples.

Dr. Allen testified at the *Frye* hearing that the product rule is a generally accepted method in the scientific community for determining population frequency statistics. To support his argument that the product rule is not generally accepted, Kinder relies principally upon a 1992 report by the National Research Council (NRC), which questioned the reliability of the product rule because of the possibility of population substructure and which recommended use of the ceiling principle to calculate frequency statistics. NATIONAL RESEARCH COUNCIL, DNA TECHNOLOGY IN FORENSIC SCIENCE 77–94 (1992). Since Kinder's trial, however, the NRC has withdrawn its criticism of the product rule in a 1996 report cited by the State and acknowledged as authoritative by Kinder. In this report, the NRC concludes that the product rule is appropriate for calculating frequency probabilities and that the ceiling principle is unnecessary. *See also Morel,* 676 A.2d at 1353; *State v. Copeland,* 130 Wash.2d 244, 922 P.2d 1304, 1320 n. 6 (1996).

While this Court has not addressed the admissibility of DNA statistical evidence derived by using the product rule, the Missouri Court of Appeals has approved its use. *See State v. Huchting,* 927 S.W.2d 411, 420 & n. 3 (Mo.App.1996). Moreover, the overwhelming majority of recent cases in other jurisdictions also approve the use of the product rule. *See, e.g., Copeland,* 922 P.2d at 1319; *State v. Marcus,* 294 N.J.Super. 267, 683 A.2d 221, 231 (App.Div.1996); *Clark v. State,* 679 So.2d 321, 322 (Fla.Dist.Ct.App.1996); *People v. Dalcollo,* 282 Ill.App.3d 944, 218 Ill.Dec. 435, 445–46, 669 N.E.2d 378, 388–89 (1996); *Morel,* 676 A.2d at 1355; *Armstead v. State,* 342 Md. 38, 673 A.2d 221, 243–45 (1996); *State v. Dinkins,* 319 S.C. 415, 462 S.E.2d 59, 60–61 (1995); *People v. Chandler,* 211 Mich.App. 604, 536 N.W.2d 799, 802–03 (1995); *Lindsey v. People,* 892 P.2d 281, 295 (Colo.1995); *State v. Weeks,* 270 Mont. 63, 891 P.2d 477, 491 (1995). *See contra State v. Streich,* 163 Vt. 331, 658 A.2d 38 (1995).

■ Based on the foregoing, we hold that the product rule is generally accepted in the scientific community, and that population frequency statistics based on the product rule are admissible. Any criticism of the reliability of the product rule or of the particular methods used to apply the product rule pertains only to the weight to be given the DNA evidence by the jury. Accordingly, the trial court did not abuse its discretion by admitting the product rule evidence in this case.

■ On another tack, Kinder argues that the trial court erred in admitting the DNA evidence because the protocol used by Dr. Allen to carry out the analysis of the DNA samples was not generally accepted in the scientific community. As stated, Dr. Allen utilized the RFLP method of DNA analysis. Kinder does not challenge this method of DNA analysis, but rather appears to raise objections to how Dr. Allen carried out this method. Responding to a similar argument in *Davis,* this Court stated that "argument concerning the manner in which the tests were conducted goes more to the credibility of the witness and the weight of the evidence, which is in the first instance a discretionary call for the trial court and ultimately for the jury." 814 S.W.2d at 603.

At the *Frye* hearing, Kinder presented a number of complaints about Dr. Allen's technique that included lack of adequate standards and controls, unacceptable band shifting on the autorads, use of the overlay method to determine band location, use of eyeball assessment to determine a match, and contamination of database. These objections to Dr. Allen's techniques were also presented to the jury both through the cross-examination of Dr. Allen and through Kinder's own DNA expert. Following our holding in *Davis,* we conclude that the jury was properly allowed to weigh the evidence concerning Dr. Allen's techniques and analysis, and that the trial court committed no abuse of discretion.

Next, Kinder submits that the DNA evidence should have been excluded because his trial counsel did not receive materials for all

of their discovery requests. On March 23, 1992, Kinder filed a motion for sanctions against respondent for the alleged failure to comply with DNA discovery requests, and at a hearing on the motion Kinder requested the court either to exclude the DNA evidence or to continue the trial to allow for further discovery. The trial court overruled the motion.

Whether a sanction should be imposed for a party's noncompliance with discovery requests is a matter that lies within the sound discretion of the trial court. *State v. Neil*, 869 S.W.2d 734, 738 (Mo. banc 1994). Failure to impose sanctions for a discovery violation will be considered an abuse of discretion if the violation resulted in fundamental unfairness or substantively altered the outcome of the case. *State v. Reichert*, 854 S.W.2d 584, 597 (Mo.App.1993). In his motion for sanctions, Kinder alleged that Dr. Allen had not disclosed accuracy and viability information relating to his database, data on DNA shifting, and complete computer program information. The State replied that Dr. Allen had been cooperative in providing information and would continue to do so, and that a defense witness had indicated to the prosecution that the only information the defense was lacking was the sequencing of DNA markers. The State further informed the trial court that this information is available in scientific literature, and is as accessible to the defense as it is to Dr. Allen. All in all, Kinder has failed to provide convincing evidence of Dr. Allen's refusal to comply with DNA discovery requests and has certainly not shown fundamental unfairness or a substantively altered outcome. Therefore, the trial court did not abuse its discretion in overruling the motion for sanctions.

Kinder's final argument against the admission of the DNA evidence is that Dr. Allen altered the results of the original autorad for probe TBQ7 by removing a marking. According to Kinder, a duplicate copy of the autorad, which contained three markings, proved that the original autorad, which had only two markings, was altered after the copy had been made. Despite the fact that Kinder was aware of the allegedly altered evidence before trial, he first objected to the

evidence on this ground after it had been admitted, and as such, the objection was untimely. Furthermore, Dr. Allen's testimony under cross-examination by Kinder's counsel—that the additional mark appeared to be the result of the copying process— sufficiently explained the discrepancy. At the least, the claim of alteration was for the jury to decide. The court did not err in overruling the objection.

## D. TESTIMONY OF WHITE AND WINGO

Kinder contends that the trial court improperly allowed State's witnesses Chuckie White and Dwayne Wingo to take the witness stand and invoke their Fifth Amendment right against self-incrimination because the State called the witnesses knowing that they would invoke the privilege before the jury. This error, Kinder explains, allowed the jury to surmise that White was involved in the killing. Although a party may not call a witness to testify solely for the purpose of having that witness invoke the Fifth Amendment privilege, a court may require a witness to take the stand where there is a reasonable expectation that the witness will provide some legitimate testimony in addition to invoking his privilege against self-incrimination. *State v. Sidebottom*, 753 S.W.2d 915, 922 (Mo. banc), *cert. denied*, 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988). Once a witness refuses to answer a question because of possible incrimination, no inferences may be made, whether favorable or unfavorable to either the defendant or the prosecution. *State v. Grays*, 856 S.W.2d 87, 92 (Mo.App.1993).

When White was called to testify at trial, he invoked the Fifth Amendment in response to the State's questions regarding events that took place on December 22, 1990. The trial court instructed White to answer the questions posed, and when he continued to refuse, held him in contempt. Kinder then requested a mistrial which the trial court denied.

White had previously indicated during his deposition that he did not want to answer questions until he had consulted with an at-

torney, but he later gave a statement to both parties about the events on the night in question. Under these facts, we cannot infer that the State called White solely for the purpose of having him invoke the Fifth Amendment privilege. Furthermore, Kinder was not prejudiced because the State's theory of the case was that Kinder acted alone, and there is no indication that the State attempted to create any inference through oral argument or otherwise that White was a participant in the murder.

 In a related argument, Kinder complains that by asking questions of White, the State was able to present substantive testimony to the jury without Kinder having the opportunity to cross-examine. The jury had been instructed, however, that questions are not evidence and that it was not to speculate on what the answers to questions might have been. MAI–CR3d 302.02. This point is denied.

 The other witness, Wingo, waived his privilege against self-incrimination when he testified at his deposition. At Kinder's trial Wingo initially invoked his Fifth Amendment privilege, and the trial court then allowed portions of the deposition Wingo had given to be read to the jury. At that point, Wingo then waived his privilege a second time by answering the remaining questions on direct examination and all of Kinder's questions on cross examination. Because all the questions were in fact answered, there was neither error nor prejudice.

 Kinder also argues that the trial court erred in sustaining the State's hearsay objection during Kinder's cross-examination of Wingo when Kinder asked Wingo what the police had told him. Kinder has failed to preserve this claim for appeal, because he did not make an offer of proof as to what Wingo would have said, *State v. Harris,* 870 S.W.2d 798, 809 (Mo. banc), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994), and plain error review has not been requested. Upon gratuitous review of the record, we find that Kinder has not suffered a manifest injustice as a result of the trial court's ruling and thus is not entitled to relief.

### E. CLOSING ARGUMENT

 Kinder claims that the State was allowed to make improper and prejudicial statements during the guilt phase arguments. His principal objection is that the trial court erred in allowing the State to argue, over objection, that the jury should send a message that society wants and intends to reassert control over its streets from murderers and rapists. The trial court has considerable discretion in allowing argument of counsel, and its rulings are reversible only for abuse of discretion where argument is plainly unwarranted. *State v. Weaver,* 912 S.W.2d 499, 512 (Mo. banc 1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996). It is clear that the State can permissibly argue that the jury should send a message that criminal conduct will not be tolerated. *State v. Cobb,* 875 S.W.2d 533, 537 (Mo. banc), *cert. denied,* 513 U.S. 896, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994); *State v. Santonelli,* 914 S.W.2d 13, 14 (Mo.App.1995); *State v. Sanders,* 903 S.W.2d 234, 239 (Mo.App. 1995). That was the import of the State's argument in this case. The trial court did not abuse its discretion in overruling the objection.

 The other portions of the guilt phase argument are subject to review only for plain error because Kinder made no objection at trial. Our rule is that "[r]elief should be rarely granted on assertion of plain error to matters contained in closing argument, for trial strategy looms as an important consideration and such assertions are generally denied without explanation." *Cobb,* 875 S.W.2d at 537 (quoting *State v. Wood,* 719 S.W.2d 756, 759 (Mo. banc 1986)). The remarks Kinder complains of include statements by the State that Kinder "is not like you and me"; that the victim's "family and friends will never, ever talk to her, or see her ever again"; that the victim was a mother, daughter, sister, and friend whose life could never be returned; and that the jury would never forget how the victim's nightgown smelled when it was displayed to them. These remarks served the purpose of highlighting the seriousness of the crime committed, rather than the purpose of inflaming or

arousing fear in the jury. *See State v. Whit-field*, 837 S.W.2d 503, 511 (Mo. banc 1992). Moreover, Kinder has not shown that these remarks resulted in a manifest injustice. Therefore, the trial court did not commit plain error.

## F. INSTRUCTIONAL ERROR

■ Kinder's next claim is that the trial court erred in refusing his second degree felony murder instruction, which was patterned after MAI–CR 3d 313.06. We disagree. The trial court did submit Kinder's conventional second degree murder instruction, which was patterned after MAI–CR 3d 313.04. Under § 556.046.2, RSMO 1986, the trial court is obligated to charge the jury with respect to a lesser included offense when there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense. *See State v. Six*, 805 S.W.2d 159, 164 (Mo. banc), *cert. denied*, 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). Murder in the second degree is a lesser included offense of murder in the first degree. § 565.025.2(1)(a). In reviewing similar claims, this Court has held that "[t]he appropriate MAI–CR3d requires that the jury find the defendant not guilty of first degree murder and then conventional second degree murder before it may consider second degree felony murder." *State v. Petary*, 781 S.W.2d 534, 544 (Mo. banc 1989), *vacated on other grounds*, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990); *Six*, 805 S.W.2d at 164. When a jury convicts on first degree murder after having been instructed on both first degree and second degree murder, there is no prejudice to the defendant by the refusal to submit a second degree felony murder instruction. *Petary*, 781 S.W.2d at 544; *Six*, 805 S.W.2d at 164. This is the exact scenario in the current case, and thus Kinder was not prejudiced by the trial court's refusal to submit his second degree felony murder instruction.

Kinder also contends that the trial court erred in approving the burden of proof instruction, Instruction No. 4., on the ground that the term "reasonable doubt" is improperly defined. This argument has been fully addressed in earlier cases, and it has always been rejected. *See State v. Chambers*, 891 S.W.2d 93, 105 (Mo. banc 1994); *Harris*, 870 S.W.2d at 811. This point is denied.

## G. USE OF LEG SHACKLES

■ Kinder claims that the trial court erred in requiring him to wear leg shackles during a portion of the guilt phase of trial. The court stated on the record that the deputies and bailiffs had expressed a desire that Kinder wear leg irons, because of some remarks allegedly made by Kinder. After Kinder's counsel objected, however, the leg irons were removed, and the parties dispute whether the jury actually saw that Kinder's legs were shackled at any time. The use of restraints for courtroom security purposes is within the discretion of the trial court. *State v. Amrine*, 741 S.W.2d 665, 675 (Mo. banc 1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988); *State v. Sanders*, 903 S.W.2d 234, 239 (Mo.App.1995). In this case, there is not a clear indication that the short period of time Kinder was required to wear leg irons deprived him of his presumption of innocence. Therefore, the trial court did not abuse its discretion.

## H. SUFFICIENCY OF THE EVIDENCE

■ Kinder argues that the trial court erred in overruling his motion for judgment of acquittal at the close of the guilt phase and his motion for a new trial, because the evidence in this case was insufficient as a matter of law. In reviewing a challenge to the sufficiency of the evidence, appellate courts are limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). On review, this Court accepts as true all evidence favorable to the State, including all favorable inferences drawn from the evidence, and disregards all evidence and inferences to the contrary. *Id.* The evidence showed that Kinder possessed a metal pipe on the night of the victim's death, that he was seen leaving the victim's house at 1:00 am on the night she was killed, and that the victim's injuries were consistent with being beaten with a heavy, blunt object. The DNA

evidence established that the semen sample obtained from the victim matched Kinder's genetic profile. Further, Kinder made statements to police officers that exhibited a consciousness of guilt. Viewing this evidence in the light most favorable to the verdict, we hold that a reasonable juror could have found Kinder guilty beyond a reasonable doubt of each of the offenses charged.

## V. PENALTY PHASE

### A. TESTIMONY OF SHYE AND CULTON

During the penalty phase, the State introduced testimony from Denise Shye that Kinder had sexually assaulted her and testimony from Sandra Culton that Kinder had attempted to sexually assault her. The jury found these two incidents of sexual assault to be separate nonstatutory aggravators. Although Kinder did not properly preserve objections to the testimony of either witness, he now claims, for several reasons, that it was plain error to admit their testimony.

First, Kinder alleges that he did not receive prior notice of the aggravating circumstances the State intended to prove. According to the record, Kinder requested the names of all witnesses the State intended to call at trial and notice of statutory aggravating circumstances the respondent would rely upon if the death penalty were sought. He did not, however, specifically request, as provided by § 565.005.1, RSMo 1986, a list of *all* the aggravating circumstances the respondent intended to prove at penalty phase. The State fully complied with Kinder's requests when it provided notice of the statutory aggravating circumstances only and provided in its answer to his discovery request that it would present evidence of his background of violence and would call Denise Shye and Sandra Culton during the penalty phase of trial. Nevertheless, Kinder is now claiming that he was unprepared to defend against the testimony of Shye and Culton. Because Kinder was aware that the witnesses were to be called during the penalty phase and that his background of violence would be explored, he has failed to establish manifest injustice.

Second, Kinder claims that the testimony of Shye and Culton was evidence of unadjudicated offenses, and that he was harmed because the jury was not required to find beyond a reasonable doubt that he committed the alleged sexual assault offenses. As a general rule, the trial court "has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment." *Six*, 805 S.W.2d at 166. More particularly, this Court has held that evidence of a defendant's prior unadjudicated criminal conduct may be heard by the jury in the punishment phase of a trial. *Petary*, 781 S.W.2d at 539. This point is denied.

Finally, Kinder argues that it was error to allow Culton's testimony because she was present during the guilt phase of the trial. The decision to exclude a witness from the courtroom is a matter of trial court discretion. *State v. McMillian*, 779 S.W.2d 670, 671 (Mo.App.1989). Moreover, a trial court does not commit any error in allowing a witness to testify at trial, even if the witness was present during an earlier portion of the trial, if the court was never asked to and never did order witnesses excluded from the courtroom. *Id.* In this case, Kinder does not argue that he ever asked the trial court to exclude witnesses from the courtroom. Thus, the court did not err in allowing Culton's testimony.

### B. EVIDENCE OF AGGRAVATING CIRCUMSTANCES

Kinder makes several claims regarding the statutory aggravators submitted in this case. The jury found that two statutory aggravators existed: (1) a prior conviction for second degree assault, and (2) the fact that the murder was committed during the perpetration of rape. Section 565.032.2, RSMo Supp. 1992, lists the proper statutory aggravating circumstances for the offense of murder in the first degree. Two of these circumstances are whether "the offense was committed by a person who has one or more serious assaultive criminal convictions" and whether "the murder in the first degree was committed while the defendant was engaged in the

perpetration ... of rape." § 565.032.2(1), (11).

In his first point, Kinder contends that the trial court erred in submitting to the jury the aggravator of conviction for second degree assault. In particular, he claims that it is error to have the trial court, rather than the jury, decide if a prior conviction is a serious assault. However, this Court has previously held that, for purposes of evaluating a statutory aggravator, the determination of whether a prior conviction is a serious assault is a matter of law for the court, and the jury only finds as a matter of fact that a prior conviction actually occurred. *Whitfield*, 837 S.W.2d at 514; *State v. Smith*, 781 S.W.2d 761, 769 (Mo. banc 1989), *vacated on other grounds*, 495 U.S. 916, 110 S.Ct. 1944, 109 L.Ed.2d 306 (1990). We reaffirm this holding.

In addition, Kinder states that there was no basis for finding that his felony conviction for second degree assault, knowingly causing physical injury by means of a dangerous instrument, was for a serious assaultive offense. A necessary element of a serious assaultive offense, he explains, is a "serious physical injury," and because his second degree assault conviction was for having caused only "physical injury" it could not be a serious assault. We again disagree. This Court rejected a similar argument made in *State v. Brown*, 902 S.W.2d 278, 294 (Mo. banc), *cert. denied*, — U.S. ——, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995), a death penalty case in which one of the aggravating circumstances proffered by the State was an out-of-state felony conviction for fondling a 12–year–old child. Despite the fact that no serious injury was perpetrated on the child, this court held that the conviction represented a serious assaultive offense. The proper line between serious assaultive offenses and other assaultive offenses is the line between felonies and misdemeanors. The former are serious assaultive offenses and the latter are not. We said as much in our comment in *Brown* that "by definition a felony is a 'crime of a ... more serious nature than those designated misdemeanors.'" 902 S.W.2d at 294 (quoting Black's Law Dictionary 617 (7th ed.1990)).

The last ground of Kinder's argument that the "one or more serious assaultive criminal convictions" language in section 565.032.2(1) is unconstitutionally vague—has no merit either. This Court has previously held that this phrase is not impermissibly vague. *Sidebottom v. State*, 781 S.W.2d 791, 798–99 (Mo. banc 1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990).

In his second point, Kinder submits that the trial court erred in overruling his motion for a directed sentence of life at the end of the penalty phase, because the evidence was insufficient to support the statutory aggravators. The test for a challenge to the sufficiency of the evidence to support an aggravating circumstance is whether a reasonable juror could reasonably find from the evidence that the proposition advanced is true beyond a reasonable doubt. *Brown*, 902 S.W.2d at 294. In reviewing challenges to the sufficiency of evidence, this Court accepts as true all evidence favorable to the state, including all favorable inferences drawn from the evidence. *Harris*, 870 S.W.2d at 811.

As to the first aggravator, Kinder admits that respondent introduced the judgment and sentence of a prior conviction for second degree assault, but he argues that there was insufficient evidence to establish that this conviction was a serious assaultive conviction as required by § 565.032.2(1). This is simply a rehash of the previous argument we have just rejected, and it deserves no further discussion.

Kinder also contends that there was insufficient evidence of rape, because the DNA evidence on which the conviction was based was inadmissible, and thus should not have been considered in any context. This is another rehash. As this Court held earlier, the trial court did not abuse its discretion in admitting the DNA evidence; thus, the evidence was properly considered by the jury in its determination of whether the murder was committed during the perpetration of a rape. This point is also denied.

## C. CLOSING ARGUMENT

██ There are two portions of the penalty phase argument that Kinder argues were improper. Because Kinder did not enter a timely objection to these remarks at trial, we are again limited to a review for plain error. In the first remark, the State characterized Kinder as "evil." The second is a statement by the State that "Now that's what you are dealing with. It is your choice. You want to cage him, and feed him for the rest of his life, or do you want to do what justice demands vote for death?" The statements properly went to the character of the defendant and the appropriate punishment to be given. Kinder has failed to demonstrate that he suffered manifest injustice as a result of these arguments; therefore, we find no plain error.

## D. INSTRUCTIONAL ERROR

Kinder claims that the trial court erred in failing timely to give MAI–CR 3d 313.49, the mandatory instruction that advises the jury that the lawyer's argument does not constitute evidence. After the penalty phase arguments had been completed, it was determined that Instruction 27, which tracked MAI–CR 3d 313.49, had not been read to the jury before closing argument as required by the Notes on Use for that instruction. At that time the trial judge and the attorneys went to the jury room and Instruction 27 was read to the jurors.

██ When an MAI–CR instruction is applicable and is not given in accordance with the Notes on Use, it shall constitute error and its prejudicial effect is to be judicially determined. *State v. Gray*, 887 S.W.2d 369, 386 (Mo. banc 1994), *cert. denied*, — U.S. —, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995). Kinder cannot show that he was prejudiced by the delayed reading of Instruction 27. The jury had already been instructed before the guilt phase arguments that the argument of the parties is not evidence. Moreover, the reading of Instruction 27 almost immediately after the penalty phase arguments rather than before the arguments would actually highlight the content of the instruction. Because Kinder suffered no prejudice, the point is denied.

Kinder also objects to submission of the burden of proof instruction, just as he did in the guilt phase, on the ground that the term "reasonable doubt" is improperly defined. To reiterate our guilt phase discussion, this challenge to the reasonable doubt instruction has been fully addressed in earlier cases and always rejected. *See Chambers*, 891 S.W.2d at 105; *Harris*, 870 S.W.2d at 811; *State v. Wise*, 879 S.W.2d 494, 517 (Mo. banc 1994). This point is denied.

Kinder finally contends that the trial court violated his constitutional rights when it denied his motion to submit non-MAI penalty phase instructions and denied his challenge to the MAI penalty phase instructions. Specifically, he argues that the MAI instructions fail to properly instruct the jury on the role of aggravators and mitigators in the sentencing decision. We have previously held that the applicable MAI instruction "adequately covers the jury's consideration of mitigating circumstances," and that it is proper for the trial court to submit this instruction to the exclusion of a defendant's non-MAI instructions. *Wise*, 879 S.W.2d at 518.

## VI. RULE 29.15

In reviewing points on appeal from the denial of postconviction relief, we are limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous. Rule 29.15(k); *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc), *cert. denied*, — U.S. —, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996).

## A. DISCHARGE OF VENIREPERSON KRAMPER

Kinder argues that the motion court clearly erred in denying his claim that his constitutional rights were violated when venireperson Kramper was discharged from the venire panel and in denying his request for a sealed record. The motion court found that the disqualification of Kramper did not violate Kinder's constitutional rights. Based on our direct appeal analysis of this issue, we find that the court's conclusion was not clearly erroneous.

### B. MOTION TO DISQUALIFY TRIAL JUDGE

Kinder next argues that the motion court clearly erred in denying his claim that his constitutional rights were violated when he was tried before a judge who could not fairly serve because of racial animus and a desire for political gain. The motion court found that the trial judge did not exhibit racial bias in the conduct of the underlying trial. We agree. The only evidence of bias that Kinder points to is the removal of venireperson Kramper. We reiterate our conclusion in the direct appeal analysis that the statements made by Mr. Kramper led the trial judge to believe that Mr. Kramper was unable to fairly serve. This is not evidence that the removal of Mr. Kramper was tied to any bias against Kinder. We also agree with the motion court's finding that there was no evidence to support the allegation that the trial judge employed Kinder's trial to promote his own election efforts. This allegation was frivolous.

### C. TRIAL JUDGE'S RULE 29.15 TESTIMONY.

Kinder claims his constitutional rights were violated by the motion court's admission of the trial judge's testimony at the Rule 29.15 hearing to the effect that he had not taken any actions adverse to Kinder based on his race during the trial. Kinder argues that the trial judge's testimony went to an ultimate legal issue solely within the province of the motion court. After reviewing the trial judge's testimony, we do not find that it was testimony that went to an ultimate legal issue. The judge testified as to matters within his knowledge: whether he was biased against Kinder or whether he took any actions against Kinder because of bias. The motion court was free to afford whatever weight it deemed appropriate to the judge's testimony and to make the ultimate determination of whether the trial judge was able to fairly serve at a trial involving an African–American defendant. This point is denied.

### D. EXCLUSION OF EXPERT TESTIMONY

Kinder also claims his rights were violated by the motion court's exclusion of expert opinion that the trial judge could not fairly serve. The motion court did not allow two of Kinder's expert witnesses to testify at the Rule 29.15 hearing as to whether the trial judge could fairly serve on Kinder's case. Expert testimony is not admissible on issues of law. *Lee v. Hartwig,* 848 S.W.2d 496, 498 (Mo.App.1992). The motion court did not preclude other testimony that would help it decide this issue, and the two experts were indeed permitted to offer their opinion of whether the trial judge was biased. Because the issue of whether the trial judge could fairly serve is an issue of law, the motion court did not clearly err in disallowing the expert opinion on this issue.

### E. FUNDING FOR INVESTIGATION

Kinder contends that his constitutional rights were violated by the motion court's denial of his motion requesting the court to furnish funds for additional post-trial investigation and to hold open the evidence until the additional investigation was complete. The denial of the motion, he explains, denied him a full and fair hearing. He sought the funds to retain a DNA expert, employ an investigator, and have other evidence analyzed. Because Kinder had the benefit of the services of several DNA experts at his trial, as well as a full investigation conducted by the Public Defender's Office before trial, the request for additional funds lacks merit. This point is denied.

### F. REFUSAL TO ALLOW ADDITIONAL EVIDENCE

Kinder claims that the motion court clearly erred when it closed the evidence and denied motions for reconsideration. Specifically, Kinder argues that he was denied a full and fair hearing because he was prevented from calling his brother and his brother's wife, Sherri, as witnesses. On February 10, 1995, the motion court did in fact grant a motion to hold open the evidence to present the testimony of Kevin and Sherri Kinder, and directed that notice of the witnesses' availability be furnished to the court and the State by Friday, March 31, 1995. The notice

was not filed until April 3, 1995, and on that same day the court entered an order closing the evidence because the notice was untimely. Kinder's subsequent motions for reconsideration were denied. The only excuse for the late filing was that counsel waited until March 31, 1995 to send the notice, and then was unsuccessful in transmitting the fax. Based on this record, the motion court's order closing the evidence was not error.

## G. INEFFECTIVE ASSISTANCE OF COUNSEL

 Kinder makes various claims of ineffective assistance of counsel. To establish that counsel's assistance was so defective as to require reversal of a conviction or death sentence, the movant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In order to prevail on a claim of ineffective assistance of counsel, the movant must satisfy both the performance prong and the prejudice prong; if the movant fails to satisfy either prong, the reviewing court need not consider the other. *Sidebottom v. State*, 781 S.W.2d 791, 796 (Mo. banc 1989). Counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2065–66. The movant must also overcome the presumption that the challenged action was sound trial strategy. *Id.* at 689, 104 S.Ct. at 2065. To prove prejudice, the movant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. *See also Richardson*, 923 S.W.2d at 326–27.

## 1. CROSS-EXAMINATION OF DNA EXPERT.

 Kinder asserts that his trial counsel was ineffective in cross-examining respondent's DNA expert, Dr. Allen. In particular, Kinder complains that counsel failed to demonstrate on cross-examination that Dr. Allen's results did not lead to the conclusion that Kinder's DNA matched the sample obtained from the victim's body. This complaint centers on counsel's alleged ineffectiveness in establishing that one of the autorads Dr. Allen worked on was altered. On cross-examination, however, counsel confronted Dr. Allen with the original autorad and the copy of the autorad and asked him to explain the difference in the markings between the two exhibits. At that point, it was reasonable to conclude that it was unnecessary to cross-examine Dr. Allen in some other fashion. Subjects covered and the extent of cross-examination are matters of trial strategy and must be left to the judgment of counsel. *State v. Newson*, 898 S.W.2d 710, 717 (Mo.App.1995). Kinder has failed to overcome the presumption that the cross-examination of Dr. Allen was trial strategy. Further, Kinder cannot show that he suffered prejudice because his counsel did present the opinion of his own expert that the TBQ7 probe original autorad was altered. The motion court did not clearly err in finding that counsel was not ineffective.

## 2. DISQUALIFICATION OF TRIAL JUDGE

Kinder claims that trial counsel was ineffective in their efforts to seek to disqualify the trial judge. Once again, he argues that he was prejudiced because he was tried before a judge who could not fairly serve, relying on the exclusion of venireperson Kramper to demonstrate this prejudice. We have already discredited the allegation that Mr. Kramper's removal was a result of any bias on the part of the trial judge and that the trial judge was unable to fairly serve. This point is denied.

 In a twist on the same argument, Kinder claims that trial counsel was ineffective because they initially agreed that the trial judge could speak with Mr. Kramper in the absence of counsel. Given the fact that Kramper indicated that he wanted to speak with the court privately about a personal matter, Kinder cannot show that counsel acted unreasonably. It was reasonable to agree to this request. This point is frivolous.

### 3. FAILURE TO PRESENT A THEORY OF DEFENSE

Kinder claims that trial counsel was ineffective for failing to investigate, present evidence, and argue that someone other than Kinder was responsible for Cynthia Williams' death. Specifically, Kinder argues that reasonably competent counsel would have presented a theory of defense that the victim's husband, Don Williams, was the assailant. The selection of witnesses and the introduction of evidence are questions of trial strategy. *Leisure v. State,* 828 S.W.2d 872, 875 (Mo. banc), *cert. denied,* 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). Strategic choices made after a thorough investigation relevant to plausible options are virtually unchallengeable. *State v. Ramsey,* 864 S.W.2d 320, 340 (Mo. banc 1993), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). Trial counsel testified at the evidentiary hearing that they chose as a matter of trial strategy to attempt to place the blame for the victim's murder on the victim's sister, Pam Yokely. They believed she was a more likely suspect because the victim's son had made statements that his aunt possibly killed his mother, because Pam and the victim had been in physical fights in the past, and because Pam had been at the victim's house on the day that she was killed. Also, the DNA evidence established that the sample obtained from the victim did ´not match the genetic profile of Don Williams. From this record, we conclude that trial counsel made a valid strategic choice in presenting a defense theory that Pam Yokely, rather than Don Williams, was the murderer. The motion court did not clearly err in finding that counsel was not ineffective.

### 4. FAILURE TO PRESENT MITIGATING EVIDENCE

Kinder contends that trial counsel was ineffective for failing to investigate and present mitigating evidence that warranted a sentence less than death. In support of his position, he presents a list of witnesses that he claims counsel should have called during the penalty phase. He also maintains that counsel should have presented the results of the polygraph examinations of Kinder and Pam Yokely. Although the testimony of the witnesses that Kinder alleges should have been called would have provided positive opinions about Kinder's character, counsel did present the testimony of several other witnesses at trial concerning the positive aspects of Kinder's character. Because the testimony of the additional witnesses that Kinder alleges should have been called would have been cumulative in nature, he has not established that he was prejudiced. As to the polygraph results, there is no Missouri case upon which counsel could have relied to admit these results. The motion court did not clearly err in finding that counsel was not ineffective.

### 5. FAILURE TO STRIKE PROSPECTIVE JUROR

Kinder alleges counsel was ineffective for failing to strike venireperson Patricia Porter for cause during voir dire. Ms. Porter did serve as a juror on Kinder's case. During voir dire, counsel asked the venire panel whether any of them or any of their family members had been the victim of a crime. Ms. Porter indicated that her niece was abducted and raped, and that she was unable to put aside this experience and could not refrain from using that experience to persuade others during deliberation. An admission by a venireperson that she could not put a past experience out of her mind "is not determinative of the qualifications of the venireman." *State v. Johns,* 679 S.W.2d 253, 263–64 (Mo. banc 1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). The proper question "is whether or not that experience would produce bias or prejudice against the defendant on trial." *Id.* at 264. There is nothing in the record to indicate that Ms. Porter was biased against Kinder because of her niece's experience. Therefore, even if counsel had requested that Ms. Porter be stricken for cause, the trial court was not obligated to honor that request. The motion court properly denied relief.

### 6. FAILURE TO OBJECT TO ADMISSION OF METAL PIPE

Kinder argues that trial counsel was ineffective for failing to object to the

admission of a metal pipe into evidence on the ground that it was not the murder weapon. The motion court found that an objection to the admission of the pipe would have been meritless and would not have affected the outcome of the trial. The State's theory of the case was that Kinder had most likely beaten the victim with the pipe he had been carrying earlier in the evening. The pipe that was admitted at trial had been turned over by Kinder to the police. The State argued that the pipe admitted at trial was either the murder weapon itself or similar to the actual murder weapon. "As a general rule, demonstrative evidence is admissible if it is relevant ... assum[ing] that the reproduction ... fairly represents the conditions which it is offered to show." *State v. Silvey*, 894 S.W.2d 662, 667 (Mo. banc 1995) (quoting *State v. Nelson*, 484 S.W.2d 306, 307 (Mo. 1972)). Kinder does not argue that the pipe admitted at trial was not a fair representation of the pipe in his possession the night of the murder nor does he contend that the pipe admitted at trial was not recovered from him. This evidence was relevant, and an objection to its admissibility would have been unsuccessful. Therefore, counsel could not have been ineffective for failing to object.

### 7. FAILURE TO OBJECT TO TESTIMONY OF WINGO

 Kinder next contends that counsel was ineffective for failing to object to Dwayne Wingo's testimony that he had argued with and accused Kinder of planting drugs in his car, and references to such testimony. The motion court found that counsel's handling of the Wingo testimony was trial strategy. Wingo testified that he saw Kinder with a pipe on the night of the murder and saw Kinder coming out of the victim's house on that same night. On cross-examination, Kinder's trial counsel questioned Wingo about his belief that Kinder was responsible for a drug charge pending against Wingo. The record shows that counsel was attempting to bring out Wingo's bias against Kinder in order to discredit Wingo's other testimony. This was reasonable strategy. This point is denied.

### 8. FAILURE TO MOVE TO STRIKE WITNESS TESTIMONY

 Kinder alleges counsel was ineffective for failing to move to strike a portion of Denise Shye's testimony. During cross-examination, Kinder's counsel asked Shye about a telephone conversation she had with the victim's brother, David Williams, the day after the murder. Shye testified that David felt funny about the fact that Kinder was on the scene when the police arrived. Kinder argues that counsel should have moved to strike this response, and that he was prejudiced because the testimony suggested that Kinder was responsible for the victim's death. This testimony, however, occurred during penalty phase. Kinder has utterly failed to show how he was prejudiced by this testimony when the jury had already determined he was guilty of the crime. Counsel was not ineffective. The finding of the motion court was not clearly erroneous.

### 9. FAILURE TO CHALLENGE COMPOSITION OF JURY PANELS

 Kinder asserts that trial counsel was ineffective for failing to challenge the selection procedures and composition of the grand and petit jury panels in Jefferson County. A criminal defendant does have a constitutional right to the unbiased selection of a jury drawn from a cross-section of the community. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979). To establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process. *Id.* Kinder has not even attempted to argue that the second or third elements could have been established in this case, other than his allegation that the venire panel was entirely white in his case. Evidence as to the composition of a single jury panel is inadequate to meet the requirements of *Duren*. *State v. Williams*,

767 S.W.2d 87, 90 (Mo.App.1989). The motion court did not clearly err in finding that counsel was not ineffective for failing to challenge the composition and selection procedures of the jury.

## 10. FAILURE TO OBJECT TO REMOVAL OF AFRICAN–AMERICAN JUROR

■ Kinder also argues that his counsel was ineffective for objecting to the removal of Mr. Russell, an African–American, from the venire panel. Mr. Russell testified at the Rule 29.15 hearing that he was summoned for jury duty in April 1992, and that the court clerk informed him that he was excused from serving at the time of Kinder's trial. Kinder has not established how he was prejudiced by the failure of counsel to object to Mr. Russell's removal. Kinder has not alleged that any of the jurors who served on his trial were biased against him. We do not find that any prejudice resulted. The motion court did not clearly err in denying this claim.

## 11. FAILURE TO QUESTION VENIREPERSONS

Kinder argues that trial counsel was ineffective for failing to question two venirepersons about the impact of Judge Blackwell's press release on themselves and their ability to fairly serve and was further ineffective for failing to adequately question venirepersons on any potential biases against African–Americans. Kinder does not allege that any of the jurors who served on his case were biased against him. The motion court found that trial counsel's handling of the voir dire examination was a matter of trial strategy and did not impact the outcome. The court's findings are not clearly erroneous.

## 12. FAILURE TO OBJECT TO TESTIMONY OF DOBBS

■ Kinder alleges counsel was ineffective for failing to object to the testimony of Clyde Dobbs, a sanitation worker. Dobbs testified at Kinder's trial that he picked up trash from Kinder's residence on December 26, 1990, and that when he removed the lid from the trash can he detected the odor of blood on clothing contained in the trash can. Dobbs explained that from past experience he was familiar with the distinctive odor of old blood. Kinder contends that reasonably competent counsel would have objected to the testimony because Dobbs lacked the expertise to testify concerning the odor of blood. There is no indication, however, that the State was attempting to present Dobbs as an expert witness. He merely testified to his sensory impressions—what he smelled in the garbage. There would have been no merit to an objection; therefore, Kinder was not prejudiced by a failure to object. The motion court did not clearly err in finding that counsel was not ineffective.

## 13. FAILURE TO OBJECT TO EVIDENCE OF VICTIM'S GOOD CHARACTER

■ Kinder claims that trial counsel was ineffective for failing to object to the presentation of evidence and argument by the state relating to the victim's good character, and in particular to guilt phase questioning that the victim was a church-going individual and to a reference during closing argument that the victim was a "good law-abiding citizen." Although Kinder argues that these characterizations caused the jury to render its verdicts based upon passion and prejudice, he fails to demonstrate that counsel's decision not to object was not sound trial strategy. Any objection on this subject might well have done more harm than good. The motion's court conclusion that counsel's handling of the testimony and argument was trial strategy and that Kinder suffered no prejudice is not clearly erroneous.

## 14. FAILURE TO OBJECT TO IMPROPER ARGUMENTS

Kinder claims that trial counsel was ineffective for failing to object to improper remarks made during closing arguments in the guilt and penalty phases. These are the same remarks that Kinder challenged on direct appeal and that we determined were not improper. Trial counsel cannot be found ineffective for failing to object to proper arguments. Therefore, the motion court did not

clearly err in finding that counsel was not ineffective.

## 15. FAILURE TO PRESENT EVIDENCE

Kinder contends that trial counsel was ineffective for failing to present evidence that jurors misunderstand the MAI penalty phase instruction in order to support Kinder's objections to the use of those instructions. We have already addressed Kinder's challenge to the constitutionality of the MAI penalty phase instructions and concluded that it is proper for the trial court to submit the MAI instructions to the exclusion of non-MAI instructions. The constitutionality of the MAI instructions defeats Kinder's claim that counsel's performance was deficient and that he was prejudiced.

## 16. FAILURE TO OBJECT TO TESTIMONY OF SHYE AND CULTON

Kinder argues that counsel was ineffective in failing to object to the testimony of Denise Shye and Sandra Culton on the ground that the testimony would lead to an impermissible mini-trial on unadjudicated offenses. We have already considered Kinder's argument that the admission of testimony from Shye and Culton was plain error and concluded that evidence of unadjudicated criminal offenses may be heard by the jury in the punishment phase of the trial. Thus, it was not unreasonable for counsel to refrain from objecting to this testimony. The motion court did not clearly err in finding that counsel was not ineffective.

Kinder also argues that trial counsel was ineffective in failing to preserve for appeal objections to Culton's testifying in the penalty phase after she had been present in the courtroom during the guilt phase. We concluded in our direct appeal analysis of this issue that the trial court did not err in allowing the testimony of Culton, and therefore the preserving of this issue for appellate review would have made no difference. The motion court did not clearly err by denying this claim.

## VII. CONSTITUTIONALITY OF MISSOURI DEATH PENALTY STATUTE

Kinder argues that the trial court and motion court erred by rejecting his challenges to the constitutionality of the Missouri death penalty statute. His challenges were directed to the lack of meaningful proportionality review, unrestricted prosecutorial discretion, and lack of any legitimate governmental interest. This exact argument has been repeatedly rejected by this Court. *See* *State v. Brown,* 902 S.W.2d at 291. This point is denied.

## VIII. INDEPENDENT REVIEW

■ This Court is required to review, under § 565.035.3, RSMo 1994, the sentence of death imposed in this case. There is no evidence in the record that Kinder's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The record also shows that the two statutory aggravating circumstances found by the jury—that the offense was committed by a person who has one or more serious assaultive convictions and that the murder was committed by a person who was engaged in the perpetration of rape—are supported by the evidence.

We further find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering the circumstances of the crime, the strength of the evidence and the defendant's history. Strong physical evidence established that Kinder murdered the victim during the perpetration of rape. He accomplished the murder by repeatedly beating the victim's head with a heavy, blunt object. The sentence of death is consistent with the punishment imposed in other cases where the victim was murdered during the perpetration of rape or some other sex offense. *See, e.g., State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994) (affirming death penalty where defendant committed murder in furtherance of rape), *cert. denied,* —— U.S. ——, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995); *State v. Sandles,* 740 S.W.2d 169 (Mo. banc 1987) (affirming death penalty where defendant committed murder during the perpetration of rape),

*cert. denied,* 485 U.S. 993, 108 S.Ct. 1303, 99 L.Ed.2d 513 (1988); *State v. Lingar,* 726 S.W.2d 728 (Mo. banc) (affirming death penalty where defendant sexually abused and murdered victim), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); *State v. Mercer,* 618 S.W.2d 1 (Mo. banc) (affirming death penalty where defendant raped and murdered victim), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981).

## IX. CONCLUSION

For the above reasons, the judgments of conviction, sentence, and denial of postconviction relief are affirmed.

HOLSTEIN, C.J., and BENTON, ROBERTSON, and COVINGTON, JJ., concur.

PRICE, J., concurs in result.

WHITE, J., dissents in separate opinion filed.

WHITE, Justice, dissenting.

Problems do not disappear just because we close our eyes to them.

"The truth is that I have noticed in recent years that the Democrat party places far too much emphasis on representing minorities such as homosexuals, people who don't want to work, and people with a skin that's any color but white. Their reverse-discriminatory quotas and affirmative action, in the work place as well as in schools and colleges, are repugnant to me," Blackwell said. "I believe that a person should be advanced and promoted, in this life, on the basis of initiative, qualifications, and willingness to work, not simply on the color of his or her skin, or sexual preference."

"While minorities need to be represented or [sic] course, I believe the time has come for us to place much more emphasis and concern on the hard-work-ing taxpayers in this country", Blackwell said. "That majority group of our citizens seems to have been virtually forgotten by the Democrat party."

The majority's view is that Judge Blackwell's press release on the eve of the trial "merely express[es]" his "dissatisfaction with affirmative action and government entitlement programs." [1] Judge Blackwell does express that idea, but that part of the statement is irrelevant to the issue of bias. [2] What the majority admits it cannot defend, but nevertheless condones, is the pernicious racial stereotype which is also expressed in the press release. The slur is not ambiguous or complex (nor, unfortunately, original): "While minorities need to be represented ..., I believe the time has come for us to place much more emphasis and concern on the hard-working taxpayers in this country...." No honest reading of this sentence can show that it says anything other than what it says: that minorities are not hard-working taxpayers. The majority does not even try to explain how this statement is consistent with its conclusion that "the press release would [not] cause a reasonable person to question the impartiality of the court." [3] Instead, the majority chooses to focus on Judge Blackwell's self-serving comments at the disqualification hearing. The mere fact that a judge who issues a racially derogatory press release a week later claims to treat equally people who are "white, black, red, yellow, or whatever," hardly "set[s] to rest any concern" about his impartiality. I would feel much more comfortable with the judge's decision not to recuse if he had used his press release to trumpet his "prejudice toward upholding each individual's constitutional rights[,]" rather than filling it with race-baiting nonsense.

What is more troubling than the majority's inability to confront the offensive content of this press release is its willingness to ignore the important principles and substantial precedents that compel recusal. The majority

1. Op. at 321.

2. It is, however, improper. A judge who "announce[s] views on disputed legal issues" violates the Code of Judicial Conduct, Rule 2, Canon 7(B)(1)(c). Obviously, there are few more hotly disputed legal issues than the status of affirmative action.

3. Op. at 321.

describes the requirement that judges recuse themselves from cases where a reasonable person would have an objective basis to doubt their impartiality as emanating from the code of judicial conduct. The rule has a far more important source—the Constitution. "A fair trial in a fair tribunal is a basic requirement of due process." [4] The majority's reliance on the post-conviction court's finding that Judge Blackwell made no obviously unfair rulings during the trial is misplaced. To satisfy the Constitution, actual fairness is necessary, but not sufficient:

> Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.... Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." [5]

While the majority's refusal to address Mr. Kinder's constitutional argument is disconcerting, its distortion of the controlling precedent on this issue defies belief. The majority, without quoting from the case, tells us what *State v. Smulls*[6] really meant to say. "*Smulls* should be read no more broadly than for the proposition that a judicial statement —on the record or off—which raises a genuine doubt as to the judge's willingness to follow the law, provides a basis for recusal." [7] What *Smulls* actually said was: "fundamental fairness requires that the trial judge be free of the appearance of prejudice against the defendant as an individual and against the racial group of which the defen-

dant is a member." [8] This is more than a "technical legal point," as is *Smulls'* requirement that "judicial behavior must be beyond reproach[,]" and its warning that conduct suggesting racial bias "undermines the credibility of the judicial system and opens the integrity of the judicial system to question." [9]

That the majority is now pretending *Smulls* doesn't say what it says is at least understandable, since it directly contradicts their decision here. The dissenters in *Smulls* made exactly the same argument that the majority adopts today: that a judge is presumptively unbiased, despite racially provocative remarks.[10] The Court conclusively rejected that approach: "It is not the judge to whom we should afford the benefit of the doubt. The rights and due-process based expectations of the parties are the Court's proper focus.... Where there is ambiguity, the Court's obligation is to construe language in favor of assuring the appearance of fairness to the litigants...." [11]

In some regards, the judge's conduct here is more egregious than that alleged in *Smulls*, which makes the Court's about-face that much more disturbing. This is no impromptu remark, conducive to misunderstanding due to haste or inadvertent misphrasing. A lifelong Democrat and a former state senator, Judge Blackwell issued a formal press release explaining why he was switching parties months before an election. I do not doubt that the content and wording of such an important announcement were carefully considered by the judge before he disseminated it. Far from being a spontaneous outburst, this press release was a calculated attempt to influence voters by appealing to their racial prejudice. The majority tacitly admits that this is the case, but inex-

---

4. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

5. *Id.* (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)).

6. 935 S.W.2d 9 (Mo. banc 1996).

7. Op. at 322.

8. *Smulls*, 935 S.W.2d at 25.

9. *Id.* at 26–27.

10. *Smulls*, 935 S.W.2d at 28 (Limbaugh, J., concurring in part and dissenting in part) ("majority's pronouncement that '[i]t is not the judge to whom we should affirm [sic] the benefit of the doubt' is a misstatement of the law. Instead, the analysis should begin with a recognition of the well-established tenet that the honesty and integrity of judicial officers is presumed. *Withrow v. Larkin*, 421 U.S. 35, 47 [95 S.Ct. 1456, 1464–65, 43 L.Ed.2d 712] (1975).")

11. *Smulls*, 935 S.W.2d at 27.

plicably finds that this excuses the offensive conduct, rather than aggravating it. "To the extent that the comments can be read to disparage minorities, there is little point in defending them, even as the political act they were intended to be. But they are a political act, not a judicial one, and as such, they do not necessarily have any bearing on the judge's in-court treatment of minorities." [12] This distinction between "political" racism and "judicial" racism has no basis in logic or in reality. I doubt that any reasonable person would think that a judge who makes provocative comments in a campaign press release, comments which the majority admits are indefensibly racist, would be able to scrupulously set aside those views just because the judge dons a robe. The majority doesn't even try to make the argument—made in the *Smulls* dissent—that facially neutral comments are being distorted.[13] Judge Blackwell's press release would have to be grossly distorted to be read to do anything but disparage the work ethic of minorities.

Even the dissenters in *Smulls* agreed that "[r]acial prejudice is the scourge of our society...." [14] But I am at a loss to see how the majority thinks the appearance of racism can be eradicated from the judiciary if this Court turns a blind eye to racially offensive conduct by judges. Perhaps the majority sees all allegations of bias against judges as part of a "witch hunt," and fears that "even the most saintly of us may be the target of overzealous scrutiny and quite often, false claims." [15] But judges' fear of being falsely accused of bigotry can not blind us to its presence in our midst. If the majority is going to submit to this fear and abandon the high standard of judicial conduct the Court outlined in *Smulls*, it should at least be forthright enough to admit that that is what it is doing.

We must not lose sight of what is at stake in this case. The high standard of impartiality we require from judges must be further raised when the punishment imposed is death. "[D]eath is different in kind from any other punishment[,]" [16] and the burden of the death penalty has long appeared to be borne disproportionately by "people with a skin that's any color but white." [17]

Judge Blackwell's press release created a reasonable suspicion that he could not preside over this case impartially. The Code of Judicial Conduct, the Constitution, and our case law all require that in such a situation, the judge must recuse. Since the judge here failed to sustain the motion that he recuse himself, Mr. Kinder must receive a new trial before a judge whose impartiality is beyond reproach. For this reason, I respectfully dissent.

---

12. Op. at 321.

13. *Smulls*, 935 S.W.2d at 28–29 (Limbaugh, J., concurring in part and dissenting in part).

14. *Id.* at 27.

15. *Id.* at 28, 30.

16. *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (plurality opinion).

17. *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (study showing black defendants received death penalty at substantially greater rate than white defendants not sufficient basis for equal protection claim); *Furman v. Georgia*, 408 U.S. 238, 250–51, 92 S.Ct. 2726, 2732–33, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring) (providing evidence that death sentences are imposed disproportionately on black defendants).