Herbert SMULLS, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 83179.

Supreme Court of Missouri,
En Banc.

Feb. 26, 2002.

Rehearing Denied April 23, 2002.

William J. Swift, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Mr. Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

Robert Popper, Burnele V. Powell, Kansas City, MO, Christine B. Hickman, San Diego, CA, for Amicus Curiae.

LIMBAUGH, Chief Justice.

Herbert Smulls was convicted in the Circuit Court of St. Louis County of first-degree murder and other crimes and was sentenced to death. On appeal, his convictions and sentence were affirmed, but the judgment on his Rule 29.15 post-conviction motion was reversed. *State v. Smulls*, 935 S.W.2d 9 (Mo. banc 1996), *cert. denied*, 520 U.S. 1254, 117 S.Ct. 2415, 138 L.Ed.2d 180 (1997). On remand, his post-conviction motion was overruled, but again the judgment was reversed on appeal. *Smulls v. State*, 10 S.W.3d 497 (Mo. banc 2000). On the latest remand, the post-conviction motion was again overruled. This Court has jurisdiction. Mo. Const. art. V, sec. 10. The judgment is affirmed.

### I. *Background*

In 1991, Smulls was charged with first-degree murder, first-degree assault, two counts of first-degree robbery, and two counts of armed criminal action. The jury convicted Smulls of robbery but could not come to a verdict on the other charges. On retrial, Smulls was convicted on all the remaining counts. Judge William Corrigan presided at both trials. The facts surrounding the offenses, as reported in this Court's original opinion, are as follows:

Stephen and Florence Honickman owned and operated a jewelry business. Typically, customers wold make an appointment to examine the jewelry for sale. In early July 1991, a person identifying himself as "Jeffrey Taylor" called the Honickmans and made an appointment to buy a diamond. "Jeffrey Taylor" was later identified as defendant. On July 22, 1991, defendant and Norman Brown went to the Honickmans' store. After viewing several diamonds, defendant and Brown left the store without making a purchase.

On the afternoon of July 27, 1991, defendant and Norman Brown followed another customer into the store. Florence Honickman was unable to show them any jewelry at that time but suggested she might be able to help them later. Defendant and Brown returned to the store that evening. After viewing some diamonds, defendant and Brown went into a hallway, purportedly to discuss the diamond prices. A short time later, Florence Honickman looked up and saw defendant aiming a pistol at her. She then ran and hid behind a door. Defendant fired three shots at her, striking her arm and side. Defendant then fired several shots at Stephen Honickman, who was struck three times. Defendant and Brown stole jewelry worn by Florence Honickman and other items in the store. After the two men left the store, Florence Honickman contacted the police. Stephen Honickman died from his wounds, and Florence Honickman suffered permanent injuries from the attack.

A short time after the robbery, police stopped defendant and Brown for speeding. While defendant was standing at the rear of his car, the police officer heard a radio broadcast describing the men who robbed the Honickmans' store. Defendant and Brown fit the descriptions. The officer ordered defendant to lie on the ground. Defendant then ran from his car but was apprehended while hiding near a service road. The police found jewelry and other stolen items from the store in the car and in Brown's possession. The following morning police found a pistol on the shoulder of the road on which defendant drove prior to being stopped for speeding. Bullets test fired from the pistol matched bullets recovered from the store and Stephen Honickman.

*State v. Smulls,* 935 S.W.2d at 13. In penalty phase, the jury found the existence of three statutory aggravating factors:

[T]he murder of Stephen Honickman was committed while defendant was engaged in the attempted unlawful homicide of Florence Honickman; the defendant murdered Stephen Honickman for the purpose of defendant receiving money or any other thing of monetary value from Stephen Honickman; and, the murder of Stephen Honickman was committed while defendant was engaged in the perpetration of a robbery.

*Id.* at 24. Additionally, the state introduced evidence of non-statutory aggravating circumstances including Smulls' eleven prior felony convictions. In affirming the judgment imposing the death sentence, this Court determined 1) that the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor, 2) that the jury's finding of the statutory aggravating circumstance was supported by the record, and 3) that the sentence was not excessive or disproportionate to similar cases.

Despite the fact that Smulls' convictions and death sentence were affirmed, this Court held that certain comments Judge Corrigan made during a *Batson* hearing at voir dire provided "an objective basis upon which a reasonable person could base a doubt about the racial impartiality of the trial court." *Id.* at 26. These comments, coupled with allegations of pre-trial out-of-court misconduct and Judge Corrigan's status as a potential witness on those allegations, required his disqualification from Smulls' Rule 29.15 hearing. *Id.* at 27. Accordingly, Judge Corrigan's denial of Rule 29.15 relief was reversed, and the case was remanded for a new hearing. On remand, Judge Emmett O'Brien, another member of the St. Louis County Circuit Court, was assigned to hear the motion.

Smulls filed motions to *voir dire* and disqualify Judge O'Brien and all other past and present St. Louis County judges. Judge O'Brien overruled those motions and denied the Rule 29.15 motion on the merits. On appeal, this Court held that statements in a deposition taken of Judge Corrigan indicated that prior to taking the case, Judge O'Brien may have discussed the case with Judge Corrigan and should possibly have recused himself from the 29.15 hearing. *Smulls v. State*, 10 S.W.3d at 504. This Court remanded for determination of the recusal issue, but with the following proviso:

> [I]f . . . the hearing court finds no basis for disqualification of Judge O'Brien, the Rule 29 proceedings may be reassigned to Judge O'Brien for re-entry of his judgment.

*Id.* at 505.

On remand, the case was assigned to Judge James Hartenbach, yet another member of the St. Louis County Circuit Court, who, after an evidentiary hearing, determined that the motion to disqualify Judge O'Brien was properly overruled. Pursuant to this Court's directive, Judge Hartenbach ordered the case reassigned to Judge O'Brien, and Judge O'Brien then re-entered his judgment overruling Smulls' Rule 29.15 motion. Smulls now appeals the determination that Judge O'Brien could properly hear the motion as well as Judge O'Brien's denial on the merits of his Rule 29.15 motion.

## II. *Smulls' Motion to Disqualify All St. Louis County Judges*

■ After the 1996 remand, Smulls filed a motion to disqualify all current and former judges of the St. Louis County Circuit. That motion was overruled. The issue was briefed on the second appeal to this Court and denied. *Smulls v. State*, 10 S.W.3d at 499–500. Smulls now attempts to raise the issue again. However, this Court's earlier resolution of the issue on the merits is the law of the case and the issue may not be raised again. *Williams v. Kimes*, 25 S.W.3d 150, 153–54 (Mo. banc 2000).

## III. *Motion to Disqualify Judge O'Brien*

### A. *Exclusion of Evidence*

■ Smulls first claims that Judge Hartenbach erred in excluding certain evidence from the hearing that pertained to Judge O'Brien's alleged bias: (1) the testimony of two judges from St. Louis City expressing concern that a campaign was being waged by other judges in favor of Judge Corrigan and against the author of this Court's first opinion; (2) letters sent to this Court by other judges on Judge Corrigan's behalf asking this Court to rehear Smulls' case; and (3) certain newspaper articles from the *St. Louis Post–Dispatch* harshly critical of Judge Corrigan.

Smulls contends the evidence is relevant because it would engender sympathy for Judge Corrigan and pressure Judge O'Brien to vindicate his fellow judge. Additionally, Smulls points to this evidence to establish that Judge O'Brien was influenced by extra-judicial factors, giving rise to an appearance of impropriety. *See State v. Hunter*, 840 S.W.2d 850, 866 (Mo. banc 1992).

Judge Hartenbach rejected this evidence because it was irrelevant. This Court agrees. Smulls did not show that Judge O'Brien had been exposed to any of the specific evidence in question, nor did Smulls attempt to ask Judge O'Brien about it during O'Brien's testimony at the hearing before Judge Hartenbach. Although Judge O'Brien testified that he was generally aware of newspaper articles on the issue, he could not recall the content of

any of them. As for the concern from the two St. Louis City judges and the letters to this Court, Judge O'Brien testified that he was not aware of any effort by the legal community to influence this Court's opinion. Because he had no knowledge of the rejected testimony, letters, and articles, they could not have influenced him. Even if Judge O'Brien had been aware of the evidence, this alone would not require his disqualification because judges are presumed to be able to set such evidence aside in deciding a case. *See State v. Taylor*, 929 S.W.2d 209, 220 (Mo. banc 1996).

### B. *Judge O'Brien's Impartiality*

■ Smulls next claims Judge Hartenbach erred in his determination that Judge O'Brien could impartially hear Smulls' Rule 29.15 motion on remand. The basis of the claim, from Smulls' point relied on, is that "O'Brien was with Corrigan when Corrigan condemned this Court's calling him 'a racist' and O'Brien may have participated in criticizing language that produced lobbying against this Court thereby creating an appearance of impropriety. . . ." This claim arises against the backdrop of this Court's revision of its original opinion in *Smulls I* by deleting certain language that was highly critical of Judge Corrigan. *See Smulls v. State*, 10 S.W.3d at 506, n. 2 (Limbaugh, J., dissenting).

■ The Due Process Clause of the United States and Missouri Constitutions guarantee a criminal defendant an impartial tribunal, permitting any litigant to remove a biased judge. *State v. Taylor*, 929 S.W.2d at 220. Canon 3(D)(1) of the Missouri Code of Judicial Conduct, Rule 2.03, requires a judge to recuse in a proceeding where a "reasonable person would have a factual basis to doubt the judge's impartiality." *Id.* This standard does not require proof of actual bias, but is an objec-

tive standard that recognizes "justice must satisfy the appearance of justice." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1986). Under this standard, a "reasonable person" is one who gives due regard to the presumption "that judges act with honesty and integrity and will not undertake to preside in a trial in which they cannot be impartial." *State v. Kinder*, 942 S.W.2d 313, 321 (Mo. banc 1996). In addition, a "reasonable person" is one "who knows all that has been said and done in the presence of the judge." *Haynes v. State*, 937 S.W.2d 199, 203 (Mo. banc 1996). Finally, as to due process challenges, the Supreme Court has made clear that "only in the most extreme of cases would disqualification on this basis be constitutionally required." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986); *see also State v. Jones*, 979 S.W.2d 171, 177 (Mo. banc 1998).

In view of the allegations raised by Smulls, two cases are particularly helpful. In *State v. Nunley*, 923 S.W.2d 911, 918 (Mo. banc 1996), an issue presented was whether a resentencing judge from the same circuit as the original judge could "set aside his feelings for the original trial judge" and come to an independent sentencing determination. Similarly, in *State v. Taylor*, 929 S.W.2d at 220, the defendant argued that due to the collegial relationship between the resentencing judge and the original judge, the resentencing judge would want to "give[ ] the original judge a vote of confidence" by imposing the same sentence. In both *Nunley* and *Taylor*, this Court held that disqualification was not required absent evidence of a special relationship between the judges that might create an appearance of impropriety. *Id.; Nunley*, 923 S.W.2d at 918.

Here, Smulls has failed to establish that such a special relationship existed.

More particularly, there is no basis for establishing that special relationship, much less an appearance of impropriety, through the allegation that O'Brien knew Corrigan condemned this Court for calling him "a racist," and that O'Brien, himself, may have criticized this Court's original opinion. In that regard, the record of Judge O'Brien's interaction with Judge Corrigan shows the following: Judge Corrigan testified that he discussed this Court's decision with many judges on the St. Louis County Circuit bench; some of those judges criticized this Court's opinion, and he and Judge O'Brien discussed the case at some point between the issuance of this Court's original and modified opinions; however, Judge Corrigan was not sure whether his discussion with Judge O'Brien was superficial or even whether Judge O'Brien was one of the judges who criticized the opinion.

Judge O'Brien testified that he did not recall overhearing Judge Corrigan express any specific disagreement, including any specific disagreement with language used in this Court's original opinion. When asked if he and Judge Corrigan discussed the racial bias claim in *Smulls*, Judge O'Brien stated, "I've heard statements made by Judge Corrigan, none of which were after the modified opinion came out ... I don't think any of them dealt with specific issues within the opinion. I think it was just an overall displeasure with the opinion." Judge O'Brien also testified that he did not have any contact with Judge Corrigan after the modified opinion was issued, and he avoided contact with anyone discussing the case because he knew it was possible that he would be assigned to hear the case. At most, he presumed the opinion "was not Judge Corrigan's favorite,"

because it was critical of Judge Corrigan's fitness for the bench.

Finally, there is no evidence that Judge O'Brien "participated in criticizing language that produced lobbying against this Court," nor, as noted, is there evidence that Judge O'Brien even knew of allegations to that effect. In fact, his only criticism on this record was that this Court's comments regarding Judge Corrigan's fitness for the bench was a matter better suited for the Commission on Retirement, Removal and Discipline. That criticism does not establish disqualifying bias, if for no other reason than that the criticism was validated when this Court deleted the comments regarding Judge Corrigan's fitness.

In sum, Smulls failed to prove, either through the existence of a special relationship between Judge O'Brien and Judge Corrigan or through Judge O'Brien's comments and actions themselves, that a reasonable person would have reason to doubt Judge O'Brien's impartiality.

### IV. *Denial of Rule 29.15 Claims with Evidentiary Hearing*

The effect of this Court's determination that Judge O'Brien could hear Smulls' Rule 29.15 hearing is that Judge O'Brien's denial on the merits is reinstated. Smulls' amended motion contained twenty-six claims. All but five were dismissed without an evidentiary hearing. An evidentiary hearing was granted on the five claims, as well as several from Smulls' *pro se* motion. These include ineffective assistance of counsel claims for (a) failure to move for Judge Corrigan's disqualification, (b) failure to present the results of gunshot residue tests performed on Smulls and his accomplice, (c) failure to present certain mitigating factors in penalty phase, and (d) discouraging Smulls from testifying at his second trial. All of these claims were

denied. The standard of review is as follows:

This Court's review is limited to determining whether the motion court clearly erred in its findings and conclusions. The findings and conclusions of the motion court are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite impression that a mistake has been made.

*Rousan v. State*, 48 S.W.3d 576, 581 (Mo. banc 2001) (citations omitted).

### A. *Failure to Move for Judge Corrigan's Disqualification*

The principal claim of this appeal is that Smulls' trial counsel was ineffective for failing to discover evidence of Judge Corrigan's racial bias and move for his disqualification. This claim is based essentially on the same allegations and conduct this Court considered in disqualifying Judge Corrigan from hearing the Rule 29.15 motion: 1) that prior to the case, Judge Corrigan told a racist joke to a group of judges, that judgment had been entered against him for sexual harassment, and that he discriminated against African–American defendants in the disposition of criminal cases; and 2) that during the case, he made racially insensitive comments at the *Batson* hearing.

Although the circumstances of the *Batson* hearing were reported extensively in the first *Smulls* opinion, they bear repeating here: The defendant noted that Ms. Sidney was the only remaining black venireperson and requested a *Batson* hearing. When the prosecutor stated his reasons for striking Ms. Sidney, Smulls' counsel claimed the reasons were pretextual and requested a mistrial. The court denied defendant's request. The next day, Smulls' counsel renewed the *Batson* challenge and stated for the record that Judge

Corrigan would have been aware the victims were white and the defendant was black because he presided over the first trial. Judge Corrigan stated he did not remember who was black and who was white, but that he would accept the defendant's statement. He then reiterated his denial of the *Batson* claim. When the defendant again noted that Ms. Sidney was the last black venireperson, Judge Corrigan stated that he did not know what it meant to be black, that he never takes judicial notice of a person's race without direct evidence, and that it is counsel's responsibility to establish who is black and who is not. In this regard, he added:

There were some dark complexioned people on this jury. I don't know if that makes them black or white. As I said, I don't know what constitutes black. Years ago they used to say one drop of blood constitutes black. I don't know what black means. Can somebody enlighten me of what black is? I don't know; I think of them as people.

### 1. *Exclusion of Evidence*

Initially, Smulls assigns error to Judge O'Brien's exclusion of certain evidence regarding Judge Corrigan's racial prejudice.

### a. *Unofficial Transcript*

■ During the original 29.15 proceedings, Smulls directed a request for admissions to the prosecuting attorney seeking to establish that the defendant was black, the victims were white, and the jury panel selected was all white. Following longstanding custom and practice for non-evidentiary motion hearings in civil cases, Judge Corrigan did not provide the court's official reporter. Therefore, Smulls brought a private court reporter to the hearing who recorded and transcribed the following statements from Judge Corrigan:

This Court won't take the position that people are white or black. It is the Court's position that you can't look at people and determine what their race is .... If the lawyers don't want to ask the jurors whether the people are white or black or ask a witness if he's white or black, then I don't think that I—I can ask the parties to make that admission.

At the 29.15 remand hearing before Judge O'Brien, Smulls tried to admit this transcript, arguing that the transcript demonstrates Judge Corrigan's professed inability to acknowledge a person's race. Smulls also wished to present testimony and an affidavit from his original 29.15 counsel that Judge Corrigan made statements indicating he could recognize a person's race when he so chose.

On objection by the state, Judge O'Brien properly excluded the transcript on the basis that the reporter was not the official court reporter, the reporter did not appear at the hearing to attempt to authenticate the transcript, and the transcript was not self-proving. In addition, Rule 57.03(f) states that after a deposition is taken and transcribed, it must be submitted to the deponent for his reading and signature. This was not done. Subsection (g) then provides for the signature of the officer transcribing the deposition, but in the absence of the signature of the deponent, that attestation does not guarantee the accuracy of the transcript. *Coffel v. Spradley*, 495 S.W.2d 735, 738 (Mo.App. 1973). For all of these reasons, the transcript was inadmissible. Regardless, given the similarities between this transcript and Judge Corrigan's statements during the *Batson* hearing already in evidence, the transcript would have been cumulative.

b. *Counsel's Race–Recognition Testimony*

■ Smulls' former counsel attempted to testify via affidavit that during the ini-

tial Rule 29.15 hearing, Judge Corrigan referred to the woman who years before sued him for sexual discrimination as "white." The state objected to the testimony on several grounds, including relevancy, and Judge O'Brien sustained the objection. Although the testimony was offered to show Judge Corrigan's possible bias or untruthfulness about race-recognition, it is irrelevant to show counsel's ineffectiveness for failing to discover that bias or untruthfulness. For this evidence to be relevant to that claim, the evidence must have been known to counsel or discoverable during reasonable investigation. *White v. State*, 939 S.W.2d 887, 895–96 (Mo. banc 1997). However, Judge Corrigan's statement was not made to counsel until the initial Rule 29.15 hearing, after trial. Smulls' counsel could not have presented this evidence in a motion to disqualify before or during trial, many months before the statement was made.

c. *"Barbecue Joke" Evidence*

■ A *Post–Dispatch* article published in 1983 reported that Judge Corrigan said during a meeting of judges that, "We can't have a barbecue because we don't have a black judge to do the cooking." Smulls claims he offered this article not to establish whether there were in fact any black judges in the St. Louis County Circuit, but to establish that Judge Corrigan was biased and that his bias was public knowledge. He claims his counsel knew or should have discovered this alleged evidence of bias, and that that contributed to counsel's ineffectiveness in failing to file a motion to disqualify Judge Corrigan. Judge O'Brien ruled the article was hearsay.

■ "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that

depends on the veracity of the statement for its value." *Rodriguez v. Suzuki Motor Corp.,* 996 S.W.2d 47, 59 (Mo. banc 1999). To the extent that the article was offered to prove bias, it was inadmissible. Contrary to defendant's position, the truth of the matter asserted is not that they could not have a barbecue because there were no black judges available, but that Judge Corrigan *said* they could not have a barbecue because there were no black judges available. *See* 3 STEPHEN A. SALTZBURG, ET AL., FEDERAL RULES OF EVIDENCE MANUAL 1466 (7th ed.1998). On the other hand, the article was admissible to show that the allegation that Judge Corrigan was biased was a matter of public knowledge, and, in fact, Judge O'Brien admitted the testimony for that limited purpose.

Smulls also offered the deposition testimony of Judge Campbell, who related that he personally overheard Judge Corrigan making the joke. Judge O'Brien disallowed this evidence on hearsay grounds, but the state has made no effort in its brief to defend the ruling. Assuming the testimony should have been admitted, it is much less probative of what Smulls' counsel knew or should have discovered about the matter than the newspaper article. To the extent Judge O'Brien disallowed or discounted this evidence, Smulls was not prejudiced.

#### d. *Gender Discrimination Suit Evidence*

Smulls next claims the motion court erred in excluding certain evidence related to a 1982 gender discrimination suit against Judge Corrigan that resulted in a judgment against him as reported in *Goodwin v. Circuit Court of St. Louis County,* 729 F.2d 541 (8th Cir.1984). The evidence consisted of: 1) an affidavit from the plaintiff in that case to the effect that Judge Corrigan accurately identified her as "white," and 2) docket sheets reflecting that the case was heard by an African–American judge. The purported relevancy of this evidence was that it tended to show that Judge Corrigan could identify the race of a party when he so chose, and "demonstrat[ed] and prove[d] why Corrigan approximately one year later told the barbecue joke." These matters were not pled as part of the Rule 29.15 motion, and the evidence was properly excluded for that reason. Even if those matters were properly pled, the relevancy of the evidence is tenuous, especially in light of this Court's holding in the original *Smulls* opinion that the gender discrimination suit in question did not disqualify Judge Corrigan from hearing gender-*Batson* claims. *State v. Smulls,* 935 S.W.2d at 16–17.

#### e. *Exclusion of Dr. Galliher's testimony*

▪ Smulls called Dr. John Galliher, a professor of sociology who had reviewed Judge Corrigan's conduct during various trials in order to establish racial bias. Judge O'Brien excluded the evidence for a variety of reasons, ultimately concluding that the testimony was not credible. On appellate review, such a determination will rarely be overturned because a trial court is in the best position to assess the credibility and usefulness of expert testimony. *Rousan v. State,* 48 S.W.3d at 589.

In an offer of proof, Dr. Galliher discussed at length the existence and effect of unconscious racial bias in our society, that people with such bias falsely claim not to be able to recognize race and will tell jokes to express their feelings, and that there is a correlation between gender bias and racial bias. He also commented on excerpts from Smulls' trial and several of Judge Corrigan's other cases. He concluded that "Judge Corrigan's behaviors viewed together were inconsistent with adhering to *Batson's* spirit and were relevant to

Smulls' ability to have *Batson* fairly decided."

Judge O'Brien rejected this testimony in part because it did not satisfy the *Frye* test that an expert opinion must be based upon a valid and accepted scientific methodology and assist the trier of fact in the determination of an issue. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993); *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). Dr. Galliher admitted that his opinions were not based upon a random sampling of Judge Corrigan's cases or any first-hand observation of any of Judge Corrigan's cases. He testified that Judge Corrigan berates black defendants in a manner not found in cases with white defendants, but admitted that he did not look beyond the nine cases selected by Smulls (out of hundreds heard), and that the defendants were black in only six of those nine cases. The circumstances of these cases prove the point: In one case, Judge Corrigan referred to the defendant as an "animal," but the defendant had been convicted of the brutal beating and rape of an elderly woman; in another case, Judge Corrigan called the defendant a "mad dog;" but the defendant was a serial rapist; in another case, he called the defendant a "flim-flam man," but the defendant had been found guilty of forgery and defrauding his employer. The other cases are comparable. This is hardly proof of a pattern of racial bias. Moreover, Dr. Galliher was not able to identify any prejudice in the actual imposition of sentences and noted Judge Corrigan consistently followed the jury's recommendation. For these reasons, Judge O'Brien did not abuse his discretion in rejecting Dr. Galliher's testimony.

f. *Smulls' Affidavits from Defense Attorneys*

■ Next, Smulls complains that Judge O'Brien improperly excluded "evidence about an alleged policy of racial discrimination by St. Louis County prosecutors in voir dire." This evidence was offered by way of affidavits from three local criminal defense lawyers and was designed to show that Smulls' counsel should have disqualified Judge Corrigan to avoid the combination of a biased prosecutor and a biased judge. This claim fails because it was determined in the initial appeal that no error occurred in deciding the merits of the *Batson* challenge. *State v. Smulls*, 935 S.W.2d at 14–16.

2. *Stay of Judge O'Toole's Deposition*

■ Smulls subpoenaed Judge Daniel O'Toole, claiming Judge O'Toole also heard Judge Corrigan tell the "barbecue joke." At the state's request, Judge O'Brien stayed the deposition until he determined Smulls was entitled to an evidentiary hearing on the ineffective assistance of counsel claim to which the deposition related. Judge O'Brien lifted the stay on January 5, 1998, but he denied Smulls' motion for a continuance of the evidentiary hearing until the deposition could be taken. Nonetheless, he assured Smulls that additional time would be provided as necessary. Smulls scheduled the deposition for March 9, 1998, but Judge O'Toole died on that very day after an extended bout with cancer.

Smulls first claims that the state had no standing to request the stay. Smulls is mistaken. The rules of civil procedure apply to Rule 29.15 motions. Rule 29.15(a). Rule 56.01(c) permits any party to file a motion for a protective order. A request for a stay order falls within that rule.

Smulls next claims that the trial court's stay of the deposition was improper because Smulls was denied access to a witness who had useful information. "Trial

courts have broad discretion in administering rules of discovery, which this Court will not disturb absent an abuse of discretion." *State ex rel. Crowden v. Dandurand,* 970 S.W.2d 340, 343 (Mo. banc 1998). As noted, the basis of the state's motion was that the deposition was premature and unduly burdensome until the motion court determined whether Smulls was entitled to an evidentiary hearing. The stay was proper under Rule 56.01(c), which permits the trial court to make "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Smulls' citation to Rule 56.01(b)(1), which states that parties are entitled to discovery on any relevant matter, does not address the issue. Judge O'Brien's ruling was not a determination that Smulls was not entitled to the discovery. The stay was in place only until he granted an evidentiary hearing and was lifted three months prior to Judge O'Toole's death. There was no abuse of discretion. *See State v. Ferguson,* 20 S.W.3d 485, 504 (Mo. banc 2000).

Smulls also argues that Judge O'Brien improperly refused to continue the evidentiary hearing until Judge O'Toole could be deposed. Smulls filed a motion requesting a continuance or, "at minimum," that the court "hold open the evidence" until the deposition could be taken. In response, Judge O'Brien denied the motion, but stated he would grant a continuance at the close of Smulls' evidence if the deposition had not yet been secured. It is well settled that "[t]he decision to grant or deny a request for a continuance ... rests within the trial court's discretion and will not be reversed absent a clear showing of abuse of discretion." *State v. Barton,* 998 S.W.2d 19, 27 (Mo. banc 1999). Because the court was willing to grant a continuance if Judge O'Toole's deposition was not taken by the time Smulls rested his case, there was no abuse of discretion.

### 3. *Admission of Judge Corrigan's Character Witnesses*

 Smulls objected to the relevancy of the state's presentation of five prominent criminal defense attorneys who know Judge Corrigan and testified to his reputation as being free of bias when judging cases involving African–Americans. Smulls concedes that character evidence is relevant when put in issue by the nature of the proceeding, and his real complaint seems to be that character evidence has no bearing on racial bias. However, an inquiry into a judge's alleged racial bias cannot be conducted *without* an inquiry into the judge's character because the presence or absence of racial bias is part of a judge's character. Where, as here, a party has opened the door by introducing evidence of bad character as manifested by racial bias, the other party may introduce evidence of good character as manifested by the lack of racial bias.

Citing *Clemmons v. State,* 785 S.W.2d 524, 531 (Mo. banc 1990), Smulls also argues that the character and reputation witnesses were not competent to testify because their testimony relates solely to "issues the motion court must decide." It is clear from their testimony, however, that the witnesses were testifying not as experts on a matter of law, but as persons familiar with Judge Corrigan's judicial temperament. In *Clemmons,* the attorneys were impermissibly testifying regarding ineffective assistance of counsel, an issue of law. *Id.* In contrast, the witnesses here testified regarding bias, a factual determination. *See State v. Kinder,* 942 S.W.2d at 334 (Mo. banc 1996); *State v. Thomas,* 596 S.W.2d 409, 413 (Mo. banc 1980).

### 4. *Analysis of the Evidence of Racial Bias*

 To succeed on the claim that trial counsel should have disqualified

Judge Corrigan on the ground of racial bias, Smulls must show that there was evidence of such disqualifying bias that his trial counsel knew of or could have discovered with a reasonable amount of investigation. *White v. State,* 939 S.W.2d at 895–96; *State v. Twenter,* 818 S.W.2d 628, 640 (Mo. banc 1991). Smulls has not done so. Most of the pre-trial, out-of-court evidence that purportedly indicated Judge Corrigan's racial bias should not be considered because it was properly excluded from evidence at the Rule 29.15 hearing before Judge O'Brien. In particular, the newspaper article about the racist joke was hearsay, and the report from Dr. Galliher on Judge Corrigan's allegedly disparate treatment of black defendants was not based on scientific study and lacked credibility otherwise.

Even if that evidence had been properly admitted, it is not evidence that trial counsel knew of or could have discovered with a reasonable amount of investigation. To uncover evidence that Judge Corrigan allegedly told a single racist joke to an informal group of judges some ten years before trial, even when the joke was reported in the newspaper, is not required as part of any *reasonable* investigation. This is especially true considering trial counsel has only limited resources and must necessarily be given deference as to the target and scope of such investigation. *See State v. Clay,* 975 S.W.2d 121, 143 (Mo. banc 1998). This conclusion applies all the more to the kind of investigation conducted by Dr. Galliher. More importantly, counsel would not know the need to conduct these investigations until the allegedly racially insensitive remarks were made during the *Batson* hearing *after the trial had commenced.* Only then did the issue of Judge Corrigan's racial prejudice clearly present itself.

Furthermore, even had counsel conducted the kind of pre-trial investigation that Smulls, in hindsight, now claims was required, the investigation would have likely turned up as much evidence that Judge Corrigan was not biased as evidence that he was biased. The five criminal defense lawyers who practice regularly before Judge Corrigan testified unequivocally that their African–American clients had been treated fairly, and even Judge Campbell, who testified that he overheard the racist joke years ago, qualified his statement by then testifying that during the many years he had served with Judge Corrigan, he had never heard of a claim or allegation of racial bias made against him. Under these circumstances, counsel cannot be faulted for failing to move for Judge Corrigan's disqualification before trial.

Whether counsel should have moved to disqualify Judge Corrigan *after* his comments at the *Batson* hearing is perhaps another question, and ultimately, the issue to be resolved is whether counsel should have attempted to disqualify Judge Corrigan on the basis of his comments during the *Batson* hearing alone. Although this Court determined in the first *Smulls* opinion that those comments were racially insensitive, *State v. Smulls,* 935 S.W.2d at 26, Judge Corrigan's disqualification from the Rule 29.15 proceeding was required because those comments were coupled with the several allegations of pre-trial, out-of-court misconduct and the likelihood that Judge Corrigan, himself, would be a witness for those allegations. *Id.* at 27.

■ The decision to disqualify a judge is a matter of trial strategy. *State v. Ayers,* 911 S.W.2d 648, 652 (Mo. banc 1995); *see also Wilson v. State,* 626 S.W.2d 243, 248–49 (Mo. banc 1982). As with all matters of trial strategy, appellate courts are properly deferential to trial counsel's decisions. *Lyons v. State,* 39

S.W.3d 32, 36 (Mo. banc 2001). In that regard, it may well be that trial counsel perceived that Judge Corrigan's *Batson* comments were made innocuously. Further, counsel acknowledged that there was at least one important strategic reason to keep Judge Corrigan on this case: Judge Corrigan believed that the jury instruction that permitted the judge to impose the death penalty if the jury could not agree on punishment, MAI–CR3d 313.48B, was unconstitutional, and Judge Corrigan stated that he would have an extremely difficult time imposing the death penalty if the jury did not. On this record, counsel cannot be convicted of being ineffective for failing to disqualify Judge Corrigan.

■■■ Finally, hindsight shows that the decision not to disqualify Judge Corrigan did not result in prejudice. Smulls cannot point to any judicial decision that evidences Judge Corrigan's alleged bias or in which Judge Corrigan's alleged bias produced an unjust result. This Court expressed concern in its 1996 decision that Judge Corrigan's refusal to acknowledge race raises "serious questions about his willingness to do what *Batson* requires," *Smulls*, 935 S.W.2d at 26, and this Court wrote: "The trial court cannot add subtle burdens to the *Batson* process by refusing to take note of race where trial counsel properly places it at issue." *Id.* However, a careful review of the record shows that Smulls' *Batson* challenge was heard not once, but twice, and at the first hearing, Judge Corrigan did not dispute that Ms. Sidney was African–American. Indeed, the controversy did not arise until the second hearing on the second day when Judge Corrigan's memory had faded and Ms. Sidney and the other jurors who were not selected were no longer present. Ultimately, this Court determined in the original appeal that the prosecutor's preemptory strike of Ms. Sidney was not pretextual

and that Judge Corrigan correctly denied the *Batson* challenge. *Id.* at 14–16. Smulls advances no evidence indicating otherwise. The simple fact is that Judge Corrigan's skepticism at Smulls' *Batson* hearing, whether honest or obstinate, did not prevent Smulls' claims from being heard and did not prove that the outcome of that hearing or the trial as a whole was the product of the judge's bias.

### B. *Disqualification Because of Retention Vote*

■■■ Smulls next claims that his counsel was ineffective for failing to have Judge Corrigan disqualified because Judge Corrigan was worried about his upcoming retention vote in the 1992 general election. Smulls explains that given that concern, Judge Corrigan would be unwilling to consider a life sentence instead of the death penalty because a willingness to consider a life sentence might erode support at the polls. This claim is frivolous. The 1992 general election was held *before* Smulls' trial.

### C. *Failure to Present Gunshot Residue Evidence*

■■■ Gunshot residue tests were performed on Smulls and his accomplice. No residue was detected on Smulls, and the test on his accomplice was inconclusive. During the first trial, the state's expert, Dr. Rothove, was unavailable, and the parties agreed to a short stipulation regarding the test results. At the second trial, Smulls' counsel subpoenaed Rothove, but did not call him, having just learned that he would not support the theory that the accomplice fired the shots. As we understand it, Smulls' claim is that counsel did not interview Rothove in time to adjust strategy and that counsel was ineffective for failing to present the stipulation. Smulls now concedes that the stipulation

was not available on retrial and claims his counsel should have obtained an independent expert. This claim was not pled. Nevertheless, Smulls attempted to present the testimony of Donald Smith, a criminologist. Judge O'Brien gratuitously reviewed the claim, but rejected Smith's testimony because Smith could not identify which of the two suspects was the shooter, did not sufficiently duplicate the state's test, and was not otherwise credible.

Smulls must establish that his counsel was ineffective in failing to obtain an independent expert and that it is reasonably probable that the deficiency affected the outcome. *White v. State*, 939 S.W.2d at 895–96; *State v. Twenter*, 818 S.W.2d at 640. Smith testified that either one of the defendants could have been the shooter. However, in conducting his own tests, Smith did not attempt to obtain the same weapon used in the crime, and he admitted that different weapons of the same make and model can "kick off" different residues. In addition, Smith was not certain he and the state used the same machine to conduct the tests. He also was unaware that Smulls struggled in wet grass with the police and continuously wiped his hands, which can remove residue. *See Wainwright v. Lockhart*, 80 F.3d 1226, 1230 (8th Cir.1996). Based upon these factors it cannot be said that it was clear error for the motion court to find Smith's evidence lacking in credibility. *See State v. Hall*, 982 S.W.2d 675, 687–88 (Mo. banc 1998); *Wainwright*, 80 F.3d at 1230

### D. *Failure to Present Mitigating Circumstances*

■ Smulls claims Judge O'Brien clearly erred in denying his claim that his counsel was ineffective for failing to interview and present certain mitigating witnesses during penalty phase. These witnesses would allegedly have testified that he was nonviolent, amicable, abandoned at childhood, impoverished, cared for his children, and that he was helpful to friends and relatives.

■ While counsel is required to investigate possible mitigating circumstances, *Nunley*, 923 S.W.2d at 924, there is no absolute duty to present mitigating evidence. *State v. Shurn*, 866 S.W.2d 447, 472 (Mo. banc 1993). Furthermore, "[c]ounsel is not ineffective for not putting on cumulative evidence." *Skillicorn v. State*, 22 S.W.3d 678, 683 (Mo. banc 2000).

Smulls presented five witnesses during the penalty phase: Dr. Wells Hively, a psychologist; Smulls' pastor, who had known him since he was a child; a supervisor and a corrections officer at the jail where Smulls was incarcerated; and Smulls' adopted father, who had raised him since he was a year and a half old. Dr. Hively explained that Smulls is depressed, has a dependent personality, and is not violent unless he is coerced. The pastor testified that Smulls is polite, respectful and not violent. The corrections supervisor and guard testified that he was a good worker and that he did not cause trouble. His father testified that Smulls was abandoned as a child and did not finish high school, and that he still cared for Smulls as he would his own blood.

Most of the witnesses and testimony Smulls claims his counsel should have presented would be cumulative of testimony that had already been presented. In addition, the motion court, which is in the best position to evaluate credibility, found that a number of these witnesses were not credible. They include Randy Edwards and Dennis Brown, who both arrived in court to testify with a list of typed questions with parenthetical answers; Crispin Smith, who had a "close relationship" with Smulls but supposedly did not know he was on parole; Maggie Cain, who knew

Smulls only from church; and Patricia Lee, who knew him only in passing. The motion court's findings on this matter were not clearly erroneous. *Rousan v. State*, 48 S.W.3d at 589. Furthermore, in light of the aggravating factors found by the jury, Smulls has not shown that the additional mitigating testimony would have produced a different result had it been presented at trial.

### E. Smulls' Decision Not to Testify

 Smulls claims his counsel was ineffective for not advising him to testify. Smulls testified at his first trial, and the jury could not reach a verdict on the murder count. He claims this gives rise to a "reasonable probability" that he would not have been convicted had he testified at his second trial. *See Rousan v. State*, 48 S.W.3d at 581–82. "Advice of counsel that a defendant not testify, without more, is not incompetent when it might be considered sound trial strategy." *State v. Powell*, 798 S.W.2d 709, 718 (Mo. banc 1990). Smulls has an extensive criminal history, which was a subject of cross-examination during the first trial and a probable subject of cross-examination during the second trial. This would have undercut his theory that he was not the ringleader of the robbery. In addition, the trial court discussed with him his decision not to testify. The argument that his testimony at the first trial caused the hung jury is speculative, and he has not demonstrated that his counsel's decision was anything other than sound trial strategy. *See State v. Chambers*, 891 S.W.2d 93, 112 (Mo. banc 1994).

### V. Denial of Rule 29.15 Claims Without an Evidentiary Hearing

 In post-conviction relief motions, [a]n appellant is entitled to an evidentiary hearing only if his motion meets three requirements: (1) the motion must allege facts, not conclusions, warranting relief; (2) the facts alleged must raise matters not refuted by the files and records in the case; and (3) the matters of which movant complains must have resulted in prejudice.

*Morrow v. State*, 21 S.W.3d 819, 823 (Mo. 2000).

### A. Prosecutor's Motive to Seek the Death Penalty

 Smulls claims his trial counsel was ineffective for failing to investigate and challenge the prosecutor's motive to seek the death penalty. Again, to establish ineffective assistance, Smulls must describe the information his attorney failed to discover, allege that a reasonable investigation would have uncovered the information, and prove the information would have aided his position. *White v. State*, 939 S.W.2d at 895–96; *State v. Twenter*, 818 S.W.2d at 640. Further, "[t]o show that the prosecutor sought the death penalty for racially discriminatory reasons," defendant must prove that the prosecutor's decision had "a discriminatory effect" on defendant and that the decision was "motivated by a discriminatory purpose." *Morrow v. State*, 21 S.W.3d at 825. Finally, movant "must offer clear proof of discrimination in his own case." *State v. Brooks*, 960 S.W.2d at 499.

Smulls' motion alleged that: (1) he is an economically disadvantaged African–American, (2) his victims were Caucasian and the crime occurred in an affluent Caucasian suburb, (3) evidence would be presented that in factually similar homicide cases with Caucasian defendants the state did not seek the death penalty, (4) the death penalty was sought in his case because he is African–American, (5) reasonably competent counsel would have investigated and raised this matter, and (6) he

was prejudiced. Smulls claims that fear of African–American males because they are "causally linked to crime" motivated the prosecutor to seek the death penalty.

Smulls' evidence in support of these allegations consisted of a "Task Force Report on the Status of the African–American Male in Missouri" attached to his pleadings, which purportedly showed in capital cases a "glaring racial difference" that "results from the discretionary decisions of prosecutors." This evidence fails to prove purposeful discrimination specific to his case. *Morrow v. State*, 21 S.W.3d at 825. Furthermore, where, as here, the facts of the case strongly support the existence of statutory aggravating factors, not to mention Smulls' extensive criminal history, the likely motivation for seeking the death penalty is the strength of the prosecution's case. *See id.; State v. Brooks*, 960 S.W.2d at 499–500. The record does not warrant an evidentiary hearing, much less a finding of ineffective assistance of counsel.

■ Smulls also takes issue with the motion court's refusal to allow interrogatories on this claim. Because the determination to deny the claim without an evidentiary hearing was properly made solely on "the motion and the files and records of the case," discovery before the determination of which claims warrant an evidentiary hearing would be premature. *See State v. Ferguson*, 20 S.W.3d at 504. Discovery after denial of such a claim is unwarranted because the discovery is no longer "relevant to the subject matter involved in the pending action." *Id.*

### B. *Dr. Hively's Testimony*

■ Smulls claims his counsel erred in calling Dr. Wells Hively during penalty phase because Dr. Hively was not the author of Smulls' psychological report, which was prepared as evidence in mitigation. The expert who prepared the report was unavailable, and Dr. Hively, who worked with the expert on the case, was called as a replacement. Counsel cannot be faulted because she had little choice but to call another witness familiar with the report. In addition, trial counsel's testimony to the contrary notwithstanding, it is unlikely that Smulls suffered prejudice from counsel's choice to present a different expert than the one who prepared the report. Doctor Hively testified that his entire office, including himself, was involved in the preparation of the report, that he examined Smulls four times, and that his opinion was based upon those examinations as well as the results of psychological tests and police reports. The motion court's denial of this claim was not clearly erroneous.

Smulls also alleges that instead of calling Dr. Hively, his counsel should have called a "comprehensive mental health expert." Counsel is not ineffective for failing to shop around for additional experts. *Lyons v. State*, 39 S.W.3d at 41.

### C. *Penalty Phase Opening Statement*

■ Smulls claims his counsel was ineffective for commenting, during opening statement in penalty phase, that Smulls could not find a job because of a disability and turned to a life of crime as an easy way out. Smulls' eleven prior felony convictions were admissible to impeach his credibility if he took the stand and admissible regardless as an aggravating factor in penalty phase. It is a common and proper defense strategy to mention convictions first in order to soften the blow. *See Richardson v. State*, 577 S.W.2d 653, 655 (Mo. banc 1979). Counsel was not ineffective in this regard.

### D. *Failure to Object to Instructions*

Smulls claims his counsel was ineffective for failing to object to allegedly confusing

punishment phase instructions and to present survey data on the accuracy of juror comprehension. Smulls concedes that this Court has recently rejected such a claim in *State v. Deck*, 994 S.W.2d 527, 542–43 (Mo. banc 1999). The claim is denied on that basis.

### E. *Voir Dire*

Smulls claims his counsel was ineffective for failing to object when the trial court stated that, "theoretically" speaking, the defendant does not have the burden to prove that he should not be put to death. The record reflects an extensive dialogue with the juror in question, during which the trial court made it clear that the state bore the burden. Taken in context, and considering the person did not serve on the jury, the court's explanation did not misallocate the burden, and any claim the jury was tainted is speculative.

### VI. *Claims Denied on Direct Appeal*

Smulls' motion also raises a number of ineffective assistance of counsel claims in which the underlying issues were denied by this court on direct appeal: (1) failure to prove the prosecutor's reasons for striking Ms. Sidney were pretextual, *State v. Smulls*, 935 S.W.2d at 14–16; (2) failure to move to quash the entire venire because a juror who had been stricken was permitted to stay and answer questions, *id.* at 19; (3) failure to present as a mitigating factor that the accomplice admitted to shooting the victims, *id.* at 20–21; (4) failing to move for a mistrial when the jury expressed concern for its safety in notes sent to the court during guilt phase deliberations, *id.* at 22. Counsel cannot be ineffective for failing to raise non-meritorious claims.

### VII. *Conclusion*

The judgment is affirmed.

HOLSTEIN, BENTON and PRICE, JJ., concur.

WOLFF, J., concurs in separate opinion filed.

LAURA DENVIR STITH, J., concurs in part and dissents in part in separate opinion filed.

WHITE, J., concurs in opinion of LAURA DENVIR STITH, J.

WOLFF, Judge, concurring.

I concur in the principal opinion, but write separately only to raise the question of the wisdom of allowing each side nine peremptory challenges. Our system of peremptory challenges greatly encourages the racial discrimination in jury selection that *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), attempted to end. Moreover, jury selection is susceptible to being manipulated by either prosecution or defense to the extent that the resulting jury does not appear to be drawn from a reasonable cross-section of the community.

The road to Hell, it is said, is paved with good intentions. *Batson* was decided with the best of intentions—eliminating racial discrimination in the use of peremptory challenges. The present case, with its tormented history, shows that good intentions may not have led to Hades, but the road surely has been fraught with difficulty.

Justice Thurgood Marshall predicted that the protections provided for in *Batson* would be largely illusory. *Batson*, 476 U.S. at 106, 106 S.Ct. 1712 (Marshall, concurring). He was right, of course, for reasons that lawyers may find uncomfortable to acknowledge.

Our discomfort arises from the essential truth about jury selection—it is based on generalizations about a venireperson's

race, ethnicity, religion, sex, socioeconomic status, occupation, neighborhood, among other factors. Those who study jury behavior and teach trial advocacy tell us that certain types of people are preferred jurors depending on the particular type of case. For instance, it is commonly believed that plaintiffs in personal injury cases prefer jurors with ethnic backgrounds such as African–Americans, Hispanics, Irish, Jews, French, Italians, and other Mediterraneans. It is claimed that these people respond well to the emotional appeal in cases. 1 Irving Goldstein & Fred Lane, Goldstein Trial Technique, Ch 9, 86 (3d ed.2001). On the other hand, those of German, English, and Scandinavian descent are considered to be best for the defense in personal injury cases. *Id.* at Ch 9, 87. Practitioners in criminal cases make similar generalizations based on such factors. It is commonly believed, for instance, that African–American jurors view the death penalty less favorably than their white counterparts.[1]

The point is not to say that these generalizations are evil or even inaccurate. But it suffices to say that racial profiling, while not exactly invented by trial lawyers, is alive and well in the jury selection process.

Historically the peremptory challenge allowed a lawyer to strike a certain number of prospective jurors without having to state a reason. The peremptory challenge in the United States is said to have been used by states to resist the desegregation forced upon them by the federal government. Morris B. Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective*, 64 U. Chi. L.Rev. 809, 849 (Summer 1997). The original purpose of the peremptory challenge in England was to balance the playing field against the Crown's unlimited ability to eliminate prospective jurors. However, Judge Hoffman argues, the peremptory challenge in America has no such noble purpose because of our racial history. *Id.* at 844. Once the civil rights movement resulted in elimination of Jim Crow laws enforcing segregation, Judge Hoffman contends, the peremptory challenge continued to serve as an efficient final racial filter to ensure all-white juries. *Id.* at 829. The case against peremptory challenges on racial grounds may be a bit overstated because, irrespective of its use in some jurisdictions to deny African–Americans full participation in the legal system, it remains well entrenched in jurisdictions that have no history of resistance to civil rights.

Perhaps we are comfortable with our generalizations. What if a trial lawyer infers from the social sciences that members of certain racial or ethnic or religious groups are, on average, more likely than not to be favorably disposed to a client's kind of cause? As a zealous advocate in an adversary system, the lawyer may, and arguably should, consider that characteristic in determining which potential jurors to strike. This is especially true where, as in Missouri, little trial time is given to allow the lawyers to question jurors extensively to determine their actual individual attitudes. The lawyers gain some minimal information about jurors' attitudes and perceptions in the voir dire examination, but usually not enough to counter the preconceived notions that the lawyer brings to the courtroom.

---

1. The Gallup Poll last year noted, in reporting on public support for the death penalty: "Traditionally, non-whites have been much less supportive than whites, which is not surprising given the attention that has been paid to racial disparities in death sentencing. Roughly 70% of whites favor the death penalty in recent polls, while less than a majority of non-whites do." Jeffrey M. Jones, *Two–Thirds of Americans Support the Death Penalty*, Gallup Poll News Service (March 2001) *available at* www.gallup.com.

The peremptory challenge brings up a tension between two of a prosecuting attorney's ethical duties—the duty zealously to represent the client[2] and the duty to seek justice, not merely to convict.[3] If the enforcement of *Batson* is lax, then it is fairly easy for the prosecuting attorney to let the duty zealously to represent the client override the duty to seek justice. Preventing racial discrimination in jury selection is part of seeing that justice is done. *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). But this part of justice may not be done where the prosecutor believes that justice requires conviction of the defendant, although this belief should not trump other ethical norms.

When prosecutors use their peremptory challenges to strike African–Americans from the jury panel, a *Batson* challenge frequently results. The burden is placed upon a prosecutor to give a racially neutral reason for the strike. *State v. Jones*, 979 S.W.2d 171, 185 (Mo. banc 1998). Accepted racially neutral reasons may include that a juror seemed "uncommunicative," or "never cracked a smile." *Batson*, 476 U.S. at 106, 106 S.Ct. 1712, (Marshall, concurring opinion). If such reasons are sufficient to justify the prosecutor's strikes, then the protection of *Batson* is illusory, just as Justice Marshall predicted. *Id.* Moreover, the question of race may be inextricably bound up in other attributes of a prospective juror, employment status, for example, that may justify the strike. Appellate decisions, to illustrate the example, have upheld exclusion of African–Americans because of employment as postal workers. *See State v. Pepper*, 855

S.W.2d 500, 503 (Mo.App.1993), and *State v. Hudson*, 822 S.W.2d 477, 481 (Mo.App. 1991). I am not sure I understand what an attorney would have against postal workers, but it is a more or less race-neutral reason.

Examining this Court's death penalty cases from the state's three largest jurisdictions, the city of St. Louis, St. Louis County, and Jackson County since the death penalty was reinstated in 1977, the following are found: 12 of 26 cases in the City of St. Louis, seven of 17 cases in St. Louis County, and four of 12 cases in Jackson County contained *Batson* challenges. None of *Batson* challenges were successful on appeal. In examining all reported criminal appeals since 1995 that contain *Batson* challenges, it appears that there have been about 100 such cases. Of those concerning race, two were remanded to the trial court to conduct a proper *Batson* hearing.[4] Only one reported case was found that was remanded for new trial because the appellate court sustained the *Batson* challenge.[5] If *Batson* has any effect in this state, it is simply trial court law where even rumors of sustained *Batson* challenges are hard to come by.

Large-scale empirical studies seem to be lacking as to the effect of *Batson* on racial discrimination. But studies examined to date show either no effect or only a very limited effect on the use of peremptory challenges to discriminate. David C. Baldus, *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis*, U. Pa. J. Const. L., February, 2001, at 34. A study of capital

**2.** *State v. Johnson,* 702 S.W.2d 65, 69 (Mo. banc 1985).

**3.** See generally Comment to Missouri Rule 4–3.8. (Rules of Professional Conduct).

**4.** *State v. Nathan,* 992 S.W.2d 908 (Mo.App. 1999), and *State v. Dunn,* 889 S.W.2d 65 (Mo.App.1994).

**5.** *State v. Davis,* 894 S.W.2d 703 (Mo.App. 1995).

murder cases tried by juries over a 16–year period in Philadelphia found that *Batson* had no effect on prosecutorial strikes against African–American venire members. *Id.* at 70.

Apparently the most substantial effect of *Batson* in Missouri, I regret to say, has been to call into question the actions of the two trial judges in this case. In addition to the opinions in this case, *see State v. Smulls*, 935 S.W.2d 9 (Mo. banc 1996) and *Smulls v. State*, 10 S.W.3d 497 (Mo. banc 2000). It is a matter of unfortunate irony that *Batson* apparently has had little or no effect on preventing racial discrimination in the use of peremptory challenges.

The only way to eliminate completely racial profiling in jury selection is to eliminate the peremptory challenge. Justice Marshall advocated this position in *Batson*, 476 U.S. at 107, 106 S.Ct. 1712, and Justice Goldberg hinted at elimination of the peremptory challenge in his dissent in *Swain v. Alabama*, 380 U.S. 202, 244, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

■ Complete elimination of the peremptory challenge is a drastic remedy, and one that I am reluctant to espouse. Instead of complete elimination, the legislature might consider at least a drastic curtailment of the number of peremptory challenges. Section 494.480 allows nine peremptory challenges per side in death penalty cases. These strikes occur after the challenges for cause remove any prospective jurors who would not impose capital punishment.[6] So, in each case there is a panel of citizens who have indicated that they will be able to impose the death penalty if the facts justify it. Then, from that "death penalty qualified" group, the state is permitted to strike nine of the prospective jurors for no reason. This may eliminate just about everyone who might even look like they could give a capital defendant the benefit of a reasonable doubt. Does the state really need to strike nine of its citizens in order for the state to receive a fair trial, even after a jury panel is "death penalty qualified?"

A system that allows many peremptory challenges is open to manipulation by the defense as well. The popular press has many examples. *See* Dominick Dunne, Justice: Crimes, Trials and Punishments (2001). Perhaps, as Dunne reports, the prosecutor wants "twelve fascists," and defense counsel wants "twelve bleeding-heart liberals or weirdos, with the assumption that they will arrive somewhere in between." *Id.* at 15. Is the result really a fair trial before a jury drawn from a reasonable cross-section of the community?

In cases that may involve imprisonment, but not death, each side is given six peremptory challenges, and two per side where there would be no prison sentence. In a death penalty case, at least 18 citizens[7] show up and undergo voir dire examination and are sent away for no stated reason. This is a waste of time. For a juror to discern that his or her race may have been a factor is to add insult to the waste-of-time injury. This is not a proper way for the state to treat its citizens, especially those who come when summoned for service. If we, as a democratic society, believe the jury system is essential, then we ought to foster respect for

---

6. A prospective juror is removed for cause if his or her views would "prevent or substantially impair the performance of his duties as a juror ...." *State v. Six*, 805 S.W.2d 159, 166 (Mo. banc 1991), citing *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

7. The number is usually more than 18 because peremptory challenges are also allowed when alternate jurors are being selected. It is possible, but not likely, that some peremptory challenges will be unused.

this service. *See State ex rel. Linthicum v. Calvin*, 57 S.W.3d 855 (Mo banc 2001) (separate opinion of Wolff, J.).

We depend on the challenge for cause to remove prospective jurors who are biased or otherwise unsuitable for a particular case. The benefit of the peremptory strike is that it helps ensure a fair trial when the trial judge is wrong in overruling a challenge for cause. In light of the deference appropriately given to trial court rulings, a trial judge can be incorrect in overruling a challenge for cause without committing reversible error. But how many safety valves are needed for a fair trial? Nine or even six peremptory challenges seem wildly excessive. On challenges for cause, as in many other trial events, the correctness of trial court rulings is appropriately assumed. One or two peremptory challenges should be enough.

If the number of peremptory challenges were reduced to one or two, juries in racially diverse counties would more likely be representative of the community. More importantly, such a move would drastically reduce the often subtle yet always insidious racial discrimination inherent in many peremptory challenges.

LAURA DENVIR STITH, Judge, concurring in part and dissenting in part.

I agree with the principal opinion's determination that Mr. Smulls has not shown that counsel was ineffective in failing to present gunshot residue evidence or further evidence of mitigating circumstances, or in advising Mr. Smulls not to testify. I also agree that he has not shown an entitlement to an evidentiary hearing on the post-conviction claims as to which no hearing was granted.

I disagree with the principal opinion's determination whether to grant Mr. Smulls post-conviction relief due to the appearance of impropriety created by the comments of Judge Corrigan at the trial and following this Court's initial opinion in this case, *State v. Smulls*, 935 S.W.2d 9 (Mo. banc 1996) (*Smulls I*). As set out below, whether or not Judge Corrigan was in fact biased, his comments themselves caused an appearance of impropriety. This should have led this Court to order post-conviction relief in *Smulls I* rather than remanding for a further hearing, for, as *Smulls I* itself noted, the standard for whether a judge should recuse himself or herself is not whether the judge is shown to be biased in fact, but whether, based on the judge's conduct or comments:

a reasonable person would have factual grounds to find an appearance of impropriety and doubt the impartiality of the court.

935 S.W.2d at 17.[1]

Judge Corrigan's comments have been set out at length above, and no purpose would be served by repeating them here. What can be said is that, assuming that Judge Corrigan's subjective intent in making the remarks was an innocuous one, his remarks nonetheless provide factual grounds on which a reasonable person could find the appearance of impropriety and doubt the impartiality of the judge. To suggest otherwise simply ignores the fact, as stated in *Smulls I*, that:

It is not the judge to whom we should afford the benefit of the doubt. The rights and due process based expecta-

---

1. *Accord, State v. Jones*, 979 S.W.2d 171, 177–78 (Mo. banc 1998); *State v. Kinder*, 942 S.W.2d 313, 322 (Mo. banc 1996); *State v. Nunley*, 923 S.W.2d 911, 918 (Mo. banc 1996); *State v. Dodd*, 944 S.W.2d 584, 586 (Mo.App. S.D.1997); *Graham v. State*, 11 S.W.3d 807, 813 (Mo.App. S.D.1999).

tions of the parties are the court's proper focus.

*Smulls I,* 935 S.W.2d at 26. It also ignores the wisdom, amply demonstrated by the subsequent history of this very litigation, of strictly adhering to a standard of recusal based solely on the *reasonable appearance* of impropriety. That is why a "judicial statement—on the record or off—that raises a genuine doubt as to the judge's willingness to follow the law, provides a basis for recusal or, if the judge refuses to recuse, reversal on appeal." *State v. Kinder,* 942 S.W.2d 313, 322 (Mo. banc 1996).

Applying these principles here, no one familiar with the continuing saga of this case could deny that the June 1996 decision in *Smulls I,* and the subsequent history of this case, have engendered great controversy. Immediately following the initial decision, members of the bar took conflicting positions as to whether the facts created an appearance of impropriety of Judge Corrigan and whether he was being treated fairly by this Court. Over the following three and one-half years, a new hearing was held before Judge O'Brien on the issues presented by Mr. Smulls' Rule 29.15 hearing, and the judge concluded that Judge Corrigan was not biased and Mr. Smulls was not entitled to post-conviction relief.

On appeal, *Smulls v. State,* 10 S.W.3d 497 (Mo. banc 2000) (*Smulls II*), did not reach the issue of Mr. Smulls' entitlement to post-conviction relief, or even directly address Judge Corrigan's alleged improper comments at the trial. *Smulls II* addressed issues raised by the very publicity that surrounded this Court's decision in *Smulls I,* to wit, whether allowing Judge O'Brien to preside over the Rule 29.15 hearing itself created an appearance of impropriety because of Judge Corrigan's public statements castigating members of

this Court and stating that he had discussed *Smulls I* with all the judges of the circuit, including Judge O'Brien, and they had agreed with him that it was wrong.

This Court held in *Smulls II* that these conversations provided a basis on which "a reasonable person could doubt the impartiality of" Judge O'Brien. 10 S.W.3d at 504. The ensuing controversy among members of the bar and community confirmed that this was the case. While Judge O'Brien indicated that he could be impartial, and many in the community said they thought he could be impartial, and that they believed that Judge Corrigan himself was not biased and had not shown bias by his comments, others publicly disagreed. But, whether Judge O'Brien or Judge Corrigan were in fact impartial or believed themselves to be is not the issue. A judge cannot judge his own impartiality and the appearance of impropriety cannot be determined by a show of hands. The standard for recusal is whether the facts give reasonable people grounds for doubting the court's impartiality.

Now Mr. Smulls' appeal is before this Court yet a third time, some two years after the decision in *Smulls II* and five and one-half years after the decision in *Smulls I.* Yet, most of the principal opinion is again directed not to the issue of Mr. Smulls' guilt or punishment, but to the issues of (1) the propriety and appearance of propriety of Judge Corrigan; (2) the propriety and appearance of propriety of Judge O'Brien in presiding over a hearing into the propriety of his colleague's conduct; and (3) the propriety of the rulings of Judge Hartenbach in presiding over the hearing into the propriety of the conduct of Judge O'Brien in presiding over the hearing into the propriety of Judge Corrigan's conduct.

The route this case took to get here is more circuitous than the most complex

tongue-twister. Whatever else this series of events serves to show, it demonstrates the wisdom of the teachings of prior cases that doubts as to the appearance of impropriety should be resolved in favor of recusal. Otherwise, as occurred here, the focus will become the conduct and character of the judge, whereas the focus should be fairness of the trial of the defendant.

Due to this loss of focus, both the reputations of various judges and Mr. Smulls' right to a new trial have unfairly been left in doubt for over five years, and the fairness and impartiality of the Missouri judicial system has been repeatedly called into question. It is to avoid just this type of situation that recusal should be ordered where the facts raise even the appearance of impropriety in the eyes of a reasonable person. This Court should have directed in *Smulls I* that Mr. Smulls' Rule 29.15 motion be granted. I would so hold now, and remand so that a new trial can be held. This fact scenario simply should not be permitted to continue.[2]

For the reasons set out above, I concur in part and dissent in part.

---

2. I also disagree with the principal opinion's statement that in order to disqualify Judge O'Brien, Mr. Smulls was required to show that Judges O'Brien and Corrigan had a "special relationship." While a special relationship would, of course, give a reasonable person "factual grounds to find an appearance of impropriety and doubt the impartiality of the court," *Smulls I*, 935 S.W.2d at 17, so, too, would the presence of other facts that reasonably called into question the judge's impartiality. I believe the principal opinion really intends to espouse a narrower principle: that merely being a member of the same circuit as another judge is not a basis for recusal. To create doubt as to impartiality, there must be some "plus factor," such as, but not limited to, a special relationship of the judges. With this narrower principle, I fully agree.